**Dennis KERRIGAN, Plaintiff,**

v.

**A. William VILLEI, Defendant,**

v.

**Lester TAUBMAN, et al., Third Party Defendants.**

**Civil Action No. 95–4334.**

United States District Court, E.D. Pennsylvania.

Sept. 15, 1998.

Alan L. Frank, Philadelphia, PA, for Plaintiff.

Mark A. Kearney, Blue Bell, PA, for Defendants.

## FINAL ADJUDICATION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW, VERDICT AND JUDGMENT

LOWELL A. REED, JR., District Judge.

Plaintiff Dennis Kerrigan ("Kerrigan") commenced this suit against defendant A. William Villei ("Villei") in July of 1995, seeking to recover $250,000 from Villei, who acted as trustee of such monies for a business transaction between Kerrigan and Aladdin Acceptance, Inc. ("AAI"). Villei brought a third party complaint against third party defendants Lester Taubman ("Taubman"), Shirley Taubman, and AAI. Kerrigan and Villei settled their dispute before trial in December 1997. A trial was conducted before this Court on December 11, 1997 to decide the claims brought by Villei against the third party defendants. The third party defendants never answered the third party complaint of Villei and did not appear at the December 11, 1997 trial.

Villei seeks $1,184, 891.57 in compensatory damages and $500,000 in punitive damages from the third party defendants under theories of fraudulent misrepresentation, negligent misrepresentation, breach of contract, indemnification, and tortious interference with contract. Having conducted a non-jury civil trial at which counsel for Villei participated but the third party defendants did not make an appearance, and based upon the pleadings, the evidence and testimony presented at trial, and the declarations of counsel, I make the following findings of fact and conclusions of law:

## I. FINDINGS OF FACT

1. Villei is an adult individual residing in Montgomery County, Pennsylvania. (December 11, 1997 Trial Testimony of A. William Villei ("N.T. Villei") at 34). Villei is the trustee of the Villei International Trust ("the Trust"), a trust formed by him and others in the early 1990s. (N.T. Villei at 37).

2. Taubman is a shareholder and president of AAI. (Exhibit V–18; October 23, 1996 and November 4, 1996 deposition of Lester Taubman ("N.T. Taubman") at 27 (l.16–25), 28 (l.1–4)). Third party defendant Shirley Taubman is the wife of Lester Taubman and a shareholder of AAI. (November 4, 1996 deposition of Shirley Taubman ("N.T. Shirley Taubman") at 12 (l.16)). Shirley Taubman serves as the secretary of AAI. (N.T. Shirley Taubman at 18).

3. AAI has its principal place of business at 5055 Oak Hill Lane, Suite 211, Delray Beach, Florida 33484. (Exhibit V18; N.T. Taubman at 23 (1.1–7); N.T. Shirley Taubman at 13 (1.19–22)).

4. Villei formed the Trust in the British Virgin Islands and opened accounts with National Westminster Bank ("Nat West"), Barclays Bank, and PNC Bank on behalf of the Trust. (N.T. Villei at 36–37, 40).

5. Villei and the Trust are in the business of providing credibility to buyers and sellers of financial instruments issued by the top one hundred banks in the world which serve to guarantee payment on large transactions, such as the purchase of billions of dollars in commodities. (N.T. Villei at 40–44).

6. Villei introduces buyers and sellers to leading world banks, allows the buyers or sellers to close transactions in the Trust's accounts and, similar to title companies in real estate closings, acts as a closing agent on these transactions. ( *Id.* )

7. The Trust either receives the buyer's funds first (known as a "funds first" transaction) or receives certified and verifiable evidence of bona fide bank instruments for sale into its accounts from the buyers first (known as "collateral first" transactions). (October 31, 1996 dep. of Dennis Kerrigan ("N.T. Kerrigan") at 62–63; N.T. Taubman at 29–31, 35–37).

8. After Villei receives confirmation from a bank as to the validity of the buyer's funds and the validity and legality of the seller's bank instruments, Villei closes the transaction by directing the disbursement of the purchase money to the seller's bank and the transfer of bank instruments to the purchaser's bank. (N.T. Villei at 62). Villei is usually paid a fee for providing his credibility at these top banks and facilitating these transactions. (N.T. Villei at 47–48).

9. On August 15, 1993, Taubman agreed to purchase large amounts of money in bank debentures known as "standby letters of credit" and "prime bank guarantees" from

G.G. Security Holdings Corporation ("G.G. Security").[1] (N.T. Taubman at 244–251).

10. At this time, Taubman had a relationship with Barclays Bank in France through the account of "F. Micoulaud," which he intended to use as a closing agent for his transaction with G.G. Security. (N.T. Taubman at 252).

11. After August 15, 1993, Taubman ended his relationship with F. Micoulaud and Barclays Bank and began looking for an escrow agent and credibility for his transactions. (N.T. Taubman at 72 (1.12–25), 73 (1.1–8)).

12. Taubman learned in August 1993 that Villei maintained bank accounts through the Trust that were qualified and had enough credibility to serve as an account to close on these types of transactions. ( *Id.*).

13. After August 15, 1993, Taubman and Villei spoke concerning Villei's ability and willingness to help Taubman close on these transactions. (N.T. Taubman at 74 (1.9–14, 16, 19–24); N.T. Villei at 46–47).

14. In the course of their negotiations, Villei identified his bank accounts as of August 25, 1993 as a Nat West account, a Barclays account, and a PNC international account in the United States. (Exhibit V–3; N.T. Villei at 57; N.T. Taubman at 89 (1.16–25), 90 (1.1–15)).

15. Villei sent Taubman the identity of the bank officers and account numbers of these bank accounts. (Exhibit V–3; N.T. Taubman at 91 (1.6–13)).

16. Villei told Taubman that the Trust had a prepared Trust Agreement which governed its relationships with individuals who sought to use the bank accounts owned by the Trust. (N.T. Taubman at 75 (1.16), 76 (1.4–6), 77 (1.8–11); N.T. Villei at 50–52).

17. At the request of Taubman, Villei faxed the Trust Agreement to Taubman. (N.T. Villei at 51–52; N.T. Taubman at 97 (1.5–9)).

18. Taubman, a veteran of these types of transactions who had previously reviewed

---

1. The exact amount of bank debentures in this transaction is not clear from the record, but the record is filled with references to huge amounts

of money, including billions of dollars in standby letters of credit and prime bank guarantees.

trust agreements, was familiar of the meaning of the terms of the Trust Agreement. (N.T. Taubman at 82–83, 88 (1.4–7)).

19. On August 24, 1993, Taubman signed the Trust Agreement as trustor and as president of AAI and faxed it to Villei. (Exhibit V–4; N.T. Villei at 56; N.T. Taubman at 285 (1.21–25)).

20. Paragraphs 2 and 3 of the Trust Agreement provide that Villei agreed to operate the bank account in a fiduciary capacity for Taubman as the trustor and that the funds and securities deposited therein shall be held by Villei "for the benefit of" Taubman as the trustor. (Exhibit V–4 at 1 ¶¶ 2–3).

21. In paragraph 4 of the Trust Agreement, Taubman represented that the business transactions that AAI would be involved in would be in full compliance with all laws and regulations of the countries and nations where the business transactions would take place. (Exhibit V–4 at 1 ¶ 4).

22. Paragraphs 5 on page 1 and 7 on page 3 provide that in reliance upon the representations of the trustee, and in consideration of the commission of 0.25% of the amount being paid "into the trustee's account and in continuation to each transaction to be agreed upon between the parties hereto," Villei agreed to act as trustee "for the benefit of the trustor [Taubman]." (Exhibit V–4 at 1 ¶ 5 and 3 ¶ 7).

23. Paragraph 7 of the Trust Agreement specifically provided that Villei's fees and expenses must be satisfied before any funds in the bank account would be distributed even though the parties to the Agreement did not specify how the funds should otherwise distributed. (Exhibit V–4 at 3 ¶ 7).

24. Paragraph 11 of the Trust Agreement provides that:

the Trust shall not be required to institute or defend any action or legal process involving any matter referred to herein which an [sic] any manner affects it or its duties or liabilities hereunder. In the event the Trust shall institute or defend any such action or legal process, it shall do so only upon receiving full indemnity in an amount and of such character as it shall

require, against all claims, liabilities judgements [sic] attorney's fees and other expenses of every kind in relation thereto, except in case of its own willful misconduct or gross negligence.

(Exhibit V–4 at 3 ¶ 11).

25. On August 25, 1993, Taubman sent Villei a "summary sheet" of a transaction which would be closing in the Trust's accounts. (Exhibit V–2; N.T. Villei at 47–49). The summary sheet indicated that this transaction involved $10 billion of "prime bank guarantees," and the first portion, or "tranche," of the transaction was $500 million. (Exhibit V–2; N.T. Taubman at 101 (1.16–22), 103 (1.4–13)).

26. In a buy/sell contract dated August 31, 1993 which was prepared by Taubman, signed by Taubman and Mohamad Hammani ("Hammani") on behalf of Hammani Enterprises, Ltd., and witnessed by Hammani's broker Lonnie Kennemer ("Kennemer"), Taubman agreed and represented that he was ready, willing, and able to sell and deliver $20 billion in standby letters of credit for purchase by Hammani Enterprises and Hammani. (Exhibits V–7 and V–13).

27. In this "buy/sell contract," Taubman and AAI represented to Hammani that Taubman's bank account was held at Nat West under the account name "Villei." (Exhibit V–7).

28. In the buy/sell contract, Taubman required that Hammani transmit $250,000 into "his" Nat West Bank account as a performance guarantee. (Exhibit V–7).

29. Further, the buy/sell contract provided that unauthorized or unsolicited contact with Nat West by the parties was prohibited and would result in the immediate termination of the contract "with the offending party responsible for damages (express or implied) to the other." (Exhibit V–7).

30. After August 31, 1993, a "Mr. D. Reynolds" directed a "Mr. Eddy Buegels" in Holland to wire $250,000 from the bank account of Interfina B.V. at Fvan Lanschot Bankiers N.V. in Maastricht, Holland into what Taubman represented to be his account at Nat West. (N.T. Kerrigan at 99–101).

Taubman told Villei over the telephone that he owned the $250,000 wired into the Nat West account. (N.T. Villei at 71).

31. A letter dated August 31, 1993 and signed by Taubman and by Kennemer under Dennis Kerrigan's direction on behalf of Hammani contained formal wiring instructions and direction for the return of the $250,000 to another account in Barclays Bank PLC in Tortolo, BVI under the name of "Caribbean Oro" in the event that ten banking days passed with no movement in the transaction, the first tranche of the contemplated transaction equal to $500 million had been completed, or an event of mutual change in procedure agreed by both parties. (Exhibits V–13 and V–7). This letter was faxed to Villei, but I find that the date and time that this letter was faxed to Villei and by whom is unclear from the record.

32. On September 20, 1993, Taubman wrote directly to the Supervisor of the Foreign Department at Nat West advising him that a large amount of money in "prime bank guarantees" would be wired into the Nat West account on a "collateral first" transaction. (Exhibit V–18; N.T. Villei at 84–85).

33. After this contact by Taubman, Nat West declined to act as the closing bank for a collateral first transaction. (N.T. Villei at 83–84).

34. Taubman did not tell Hammani or Kerrigan that the transaction had been declined by Nat West until several weeks later. (N.T. Taubman at 235 (1.5–8); N.T. Kerrigan at 116 (1.22–23), 117 (1.1–3, 7–11)).

35. Kennemer, under the signature of Kerrigan, demanded in a letter to Nat West that Nat West immediately wire the $250,000 deposited into the Nat West account to an account denominated as "E.U.R.L.B.I.E., Mr. Pascal Vlnieska" in France. (N.T. Kerrigan at 155 (1.18–23), 156 (1.20)).

36. The Nat West Legal Department contacted Villei concerning this letter it received from Kennemer under Kerrigan's signature. (N.T. Villei at 83–84).

37. Villei advised Kerrigan that he would retain the $250,000 in his Nat West account as a fee in accordance with the Trust Agreement between him and the third party defendants. (N.T. Villei at 101–102).

38. While simultaneously attempting to close the Hammani purchase of $20 billion in standby letters of credit, Taubman continued to seek, through Villei's and the Trust's credibility, other bank accounts of Villei to assist in his transactions. (N.T. Villei at 84).

39. In September 1993, Taubman sought to open a joint account with Villei at Dresdner Bank in Kassel, Germany. (N.T. Villei at 90–92).

40. At that time Taubman advised Villei that he had sent the same transactions to Union Bank of Switzerland and that he felt he had to move forward with the transactions. (N.T. Villei at 100).

41. On October 1, 1993, Taubman deposited $250,000 into the Dresdner Bank joint account. (N.T. Villei at 94).

42. On November 22, 1993, Dresdner Bank advised Villei that Taubman's proposed "standby letter of credit" and "prime bank guarantee" transactions violated an Interagency Advisory issued by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision to the financial institutions they regulate. (Exhibit V–37; Exhibit V–55; N.T. Villei at 95–97). The Advisory details the concern over individuals who attempt to sell "prime bank guarantees" aimed at "defrauding borrowers and investors in the United States and abroad, as well as domestic and foreign banks." (Exhibit V–37; N.T. Villei at 96).

43. Dresdner Bank advised Villei that he should be attentive to the attempted use of any traditional type of financial instrument—such as a standby, performance, or commercial letter of credit—that is somehow referred to in an unconventional manner, such as letter of credit referencing forms allegedly produced or approved by the "International Chamber of Commerce." (Exhibit V–37).

44. Accordingly, Dresdner Bank immediately sent back the $250,000 deposited in Villei's Dresdner Bank account and closed the account. (N.T. Villei at 94–96). It is

unclear from the record who recovered this deposit.

45. On December 15, 1993, Barclays Bank advised Villei that they "conclude with regret that [they] can no longer act as your bankers." (Exhibit V–39). In a later conversation with Mr. Worth at Barclays, Mr. Worth informed Villei that Barclays does not deal with transactions involving standby letters of credit. (N.T. Villei at 100–101).

46. At some time after December 15, 1993, Union Bank of Switzerland, after being contacted by Taubman in September 1993, informed Villei that his account was closed. (N.T. Villei at 110).

47. Upon being contacted by James Sharp of Sharp & Associates of Lancaster, Pennsylvania, an individual doing business with Villei, Taubman advised James Sharp that Villei had "absconded" with funds which were the subject of a lawsuit in this Court. (Exhibits V–45, V–46).

48. On May 2, 1995, Kerrigan commenced suit against AAI and Villei in the United States District Court for the Southern District of Florida seeking in excess of $750,000. (Exhibits V–57, 58, 59; N.T. Villei at 103).

49. In July of 1995, Kerrigan withdrew his action against Villei in Florida and commenced this action.

50. On October 25, 1995, Kerrigan obtained final judgment in his favor and against AAI in the amount of $750,000 in damages plus $1,319.70 for attorneys fees and costs ("the Florida judgment"). (Exhibit V–40).

51. Villei paid $2,001.19 in attorney's fees and costs for his defense in the litigation in Florida. (Exhibit V–44).

52. Kerrigan and Villei settled their dispute in this Court prior to trial. Pursuant to their settlement agreement, Villei paid $20,000 to Kerrigan for the right to enforce and collect the Florida judgment. (Exhibits V–47 and V–61). In addition, Villei agreed to pay to Kerrigan $60,000 of the first $120,000 recovered from AAI under to the Florida judgment. (Exhibit V–61).

53. Through January 19, 1998, Villei paid $102,890.38 in attorney's fees and costs to his Pennsylvania counsel to defend the claims of Kerrigan and pursue these claims against the third party defendants. (Exhibit V–62).

54. Villei submitted other proposed findings of fact to this Court for their adoption. Those proposed findings which are not included here in whole or in part are not adopted by the Court because I find that they were not relevant to Villei's claims or not supported in the record.

## II. CONCLUSIONS OF LAW[2]

55. Villei brought claims against the third party defendants for indemnity under the Trust Agreement, breach of the Trust Agreement, fraudulent and negligent misrepresentation, tortious interference with contract, and punitive damages. This Court has diversity jurisdiction of this case under 28 U.S.C. § 1332. As this Court determined in its disposition of the motions of Kerrigan and Villei for summary judgment (Document Nos. 29 and 33), Pennsylvania law applies to these claims.

### A. Contractual Indemnification

■ 56. In Pennsylvania, indemnity is available "(1) where primary versus secondary or vicarious liability is present; or (2) where there is an express contract to indemnify." *Richardson v. JFK Memorial Hospital*, 838 F.Supp. 979, 989 (E.D.Pa.1993) (applying Pennsylvania law). Indemnity clauses in contracts are to be interpreted in accordance with the general rules governing contract law. *See Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409, 1415 (E.D.Pa.1988) (applying Pennsylvania law). Express indemnity contracts are construed "to effectuate the contracting parties' intent as manifested from the contract's plain language and in light of the situation of the parties and the circumstances connected with the transaction." *Richardson*, 838 F.Supp. at 990.

■ 57. Under Pennsylvania law, the duty to indemnify arises only after the in-

---

2. To the extent that these conclusions of law include findings of fact or mixed findings of fact and conclusions of law, those findings and conclusions are hereby adopted by this Court.

demnitee is obligated to pay money to a third party. *See F.J. Schindler Equipment Co. v. Raymond Co.*, 274 Pa.Super. 530, 418 A.2d 533, 534 (Pa.Super.1980) ("It is clear that before the right of indemnification arises, the indemnitor must in fact pay damages to a third party. Any action for indemnification before such payment ... is premature.")

■ 58. The indemnity clause in the Trust Agreement between Villei and the third party defendants provides that if the Trust shall institute or defend an action involving the Trust Agreement or the parties' duties or liabilities thereunder, it shall receive full indemnity against "all claims, liabilities judgements [sic] attorney's fees and other expenses of every kind in relation thereto." *See* Finding of Fact, supra, ¶ 24.

59. I conclude that the language of this indemnity clause is clear and unambiguous. I conclude that the parties intended for Villei to be indemnified for any and all judgments, liabilities, and expenses, including attorney's fees and costs, incurred by Villei in defending or pursuing a claim on behalf of the Trust arising from the performance of the Trust Agreement.

■ 60. As Villei presented no persuasive evidence to this Court that Lester Taubman acted in his individual capacity in connection with the Trust Agreement, I conclude that Lester Taubman acted only in his capacity as president of AAI and trustor under the Trust Agreement, and he is not liable for damages to Villei in his individual capacity. Similarly, as Shirley Taubman was not a signatory to the trust agreement between Villei and Taubman on behalf of AAI, and Villei presented no persuasive evidence to this Court of any involvement on her part in the transactions between Villei and Taubman which would expose her to legal liability to Villei, I conclude that Shirley Taubman is not liable to Villei for damages.

61. Under the terms of the indemnity clause, I conclude that Villei is entitled to recover from AAI $2,001.19 in attorney's fees paid to Florida counsel and $102,890.38 in attorney's fees paid to Pennsylvania counsel in connection with litigation arising from the performance of the Trust Agreement.[3] I conclude that Villei is also entitled to recover the $20,000 paid to Kerrigan in settlement of the claims between Kerrigan and Villei.

62. I conclude that Villei is not entitled to recover the $60,000 that he has agreed to pay Kerrigan out of the first $120,000 recovered under the Florida judgment because he has not yet paid that amount to Kerrigan.

**B. Breach Of The Trust Agreement**

63. Villei contends that the third party defendants breached the Trust Agreement by failing to pay fees due to the Trust for introducing the third party defendants to banking relationships, by contacting Nat West directly regarding the transaction involving prime bank guarantees, and by attempting to close illegal transactions in the Trust's accounts. Villei contends that as compensatory damages arising from the third party defendants' breach of the Trust Agreement, he is entitled to all of his pecuniary losses including $60,000, the amount he agreed to pay Kerrigan from the Florida judgment, and $1 million, the balance of the fee owed to him as Trustee, calculated at 0.25% of the first $500,000,000 tranche, less the $250,000 he retained.[4]

64. The Trust Agreement provides that the Villei's fees would be 0.25% "calculated upon the amount of [United States dollars] being paid for into the Trustee's account and in continuation of each transaction to be agreed upon between the parties hereto." *See* Finding of Fact, supra, ¶ 22. Although the language of this paragraph is not optimal, I conclude that the meaning is clear: the parties intended for Villei to receive a fee

**3.** Villei submitted an itemized list reflecting hours billed and fees charged to Villei by his counsel in this litigation. (Exhibit V–62). I reviewed this list and find that the hours and hourly fees charged to Villei by his counsel were reasonable under the circumstances of this case.

**4.** Villei also alleged that his losses include attorney fees paid to Florida and Pennsylvania counsel and the $20,000 paid to Kerrigan in settlement. Because I concluded that Villei can recover these damages under the indemnification clause of the Trust Agreement, I need not address the recoverability of these damages here.

of 0.25% of the amount of money deposited into the Trust account in connection with the transaction in the minds of the parties at the time of the contract and any other money deposited into the account in connection with any other transaction performed under the Trust Agreement.

■ 65. I conclude that Villei's contention that he is entitled to a fee of 0.25% of the expected first tranche of $500 million is unsupported by the record or the language of the Trust Agreement because there is no evidence that such an amount ever passed through the account. The record reveals that the only money actually deposited into the Trust's accounts in connection with any transactions with the third party defendants was $250,000 deposited into the Nat West account, which Villei retained, and $250,000 deposited into the Dresdner account, which was returned by the bank. *See* Finding of Fact, supra, ¶¶ 37 and 44. Thus, I conclude that Villei is entitled to a fee of 0.25% of $500,000. Having found that Villei retained the $250,000 in his Nat West account as his fee, *see* Finding of Fact, supra, ¶ 37, which is more than what he was entitled, I conclude that the third party defendants did not breach the Trust Agreement by failing to pay fees owed to the Trust.

■ 66. Villei's second argument is that the third party defendants breached the Trust Agreement by contacting Nat West directly about the transactions. The record reveals that such a provision exists in the buy/sell contract between the third party defendants and Hammani, *see* Finding of Fact, supra ¶ 29, but I conclude that Villei cannot recover damages for an alleged breach of a contract to which he was not a party. I conclude that the Trust Agreement contains no provision prohibiting the third party defendants from directly contacting the banks involved in the transactions. Thus, I conclude that the third party defendants did not breach the Trust Agreement by contacting Nat West directly, and Villei is not entitled to damages on this ground.

■ 67. Villei also argues that the third party defendants violated the Trust Agreement because the transactions they attempt-

ed to close in the Trust accounts were not in "full compliance with applicable laws and regulations" of the United States. The Trust Agreement recognizes that the third party defendants represent "that the business transactions involved are in full compliance with all applicable laws and regulations of the countries/nations where the business transactions take place and in particular relating to the laws and regulations of the currency with respect to such transactions." *See* Finding of Fact, supra, ¶ 21. I conclude that Villei did not present any persuasive evidence that the transactions that the third party defendants attempted to close in the Trust's accounts violated any laws and regulations of any country concerning currency or other matters. The only evidence Villei produced was the Advisory Report, which indicated that the type of transactions the third party defendants were attempting to complete were suspicious because of their connection to fraudulent activities. *See* Finding of Fact, supra, ¶¶ 42–43. However, Villei presented no evidence that this Advisory Report is a law or regulation of any country, and neither this Advisory Report nor the unwillingness of the banks to participate in these transactions is persuasive evidence that the transactions were illegal. Thus, I conclude that the third party defendants did not breach the Trust Agreement by attempting to close illegal transactions in the Trust's accounts, and Villei is not entitled to damages on this ground.

### C. Fraudulent And Negligent Misrepresentation

■ 68. In Pennsylvania, " '[f]raud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.' " *Pittsburgh Live, Inc. v. Servov,* 419 Pa.Super. 423, 615 A.2d 438, 441 (Pa.Super.Ct.1992) (quoting *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1251 (Pa.Super.1983)); *Mancini v. Morrow,* 312 Pa.Super. 192, 458 A.2d 580, 585 (Pa.Super.1983). To establish a claim for fraudulent misrepresentation under Pennsylvania law, a plaintiff must prove by clear and con-

vincing evidence that at the time the representation was made, it was: (1) a material representation of fact; (2) which was false; (3) that the maker was aware of its falsity or reckless as to whether it was true or false; (4) that the statement was made with the intent of misleading another into relying on it; (5) there existed a justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *See Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994); *Delahanty,* 464 A.2d at 1252.

69. To be actionable, a misrepresentation need not be in the form of a positive assertion; the misrepresentation may be a concealment of that which should have been disclosed, which deceives or is intended to deceive another to act upon it to his detriment. *See Boyle v. Odell,* 413 Pa.Super. 562, 605 A.2d 1260, 1264 (Pa.Super.1992) ("Customarily, fraud is characterized by: ... (2) a concealment, calculated to deceive; or by (3) a nonprivileged failure to disclose.")

70. To determine whether a plaintiff has presented evidence of fraud that is clear and convincing, a court considers the credibility of the witnesses, and whether witnesses "distinctly remember the facts to which they testify, and narrate the details exactly." *Pittsburgh,* 615 A.2d at 441; *Delahanty,* 464 A.2d at 1253. Fraud may be proven by the evidence of one witness; there is no requirement that it be proved by the testimony of several witnesses or by corroborating circumstances. *See Delahanty,* 464 A.2d at 1253.

71. The elements which negligent and fraudulent misrepresentation have in common are false information, justifiable reliance, causation, and pecuniary loss. *See Browne v. Maxfield,* 663 F.Supp. 1193, 1202 (E.D.Pa.1987) (applying Pennsylvania law); *Gibbs,* 647 A.2d at 889–90. The differences between fraudulent misrepresentation and negligent misrepresentation are the state of mind of the person making the representation and the standard of proof that must be met by the plaintiff. A misrepresentation is negligent is the maker fails to exercise reasonable care in supplying the information.

*See Gibbs,* 647 A.2d at 890. Unlike fraudulent misrepresentation, a plaintiff is only required to show negligent misrepresentation by a preponderance of the evidence. *See Browne,* 663 F.Supp. at 1202.

72. Villei contends that the third party defendants knowingly made numerous misrepresentations and material nondisclosures concerning the nature of the prime bank guarantees, their ability to proffer valid bank instruments, and the illegal purpose behind the sale of the bank instruments. Villei argues that the third party defendants fraudulently induced him to lend his significant creditworthiness to their fraudulent scheme.

73. I conclude that Villei failed to present clear and convincing evidence that the acts of the third party defendants constituted fraudulent misrepresentations. Villei did not establish that Taubman had an intent to deceive Villei regarding the nature of the bank instruments nor that the bank instruments served an illegal purpose. Moreover, I conclude that the evidence did not establish that the third party defendants negligently misrepresented information to Villei. The evidence showed that these standby letters of credit and prime bank guarantees raised suspicion in the banking industry regardless of their legitimacy. *See* Finding of Fact, supra ¶ 43. Taubman did not negligently withhold the nature of the transaction from Villei. Indeed, the summary sheet of the transaction sent from Taubman to Villei clearly revealed that the transaction was to involve prime bank guarantees. Thus, I conclude that Villei is not entitled to any damages on his fraudulent or negligent misrepresentation claims.

## D. Tortious Interference With Existing Contractual Relations

74. Pennsylvania has long recognized a cause of action for interference with existing contractual relations. " 'It is generally recognized that one has the right to pursue his business or employment free from interference on the part of other persons except where such interference is justified or constitutes an exercise of absolute right.' " *Total Care Systems, Inc. v. Coons,* 860 F.Supp. 236, 240 (E.D.Pa.1994) (quoting

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein,* 482 Pa. 416, 393 A.2d 1175, 1182 (Pa.1978), *cert. denied,* 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979)).

75. In order to state a claim for tortious interference with contract, a plaintiff must allege: "(1) that the acts complained of were willful and intentional; (2) that they were calculated to cause damage to the plaintiff and its business; (3) that these were done with the unlawful purpose of causing damage and loss to the plaintiff without right or justifiable cause on the part of the defendant; and (4) that actual damage and loss resulted." *Advanced Power Systems, Inc. v. Hi–Tech Systems, Inc.,* 801 F.Supp. 1450, 1458 (E.D.Pa.1992) (quoting *Boyce v. Smith-Edwards-Dunlap Co.,* 398 Pa.Super. 345, 580 A.2d 1382, 1390 (Pa.Super.1990)); *see also Shared Communications Services of 1800–80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.,* 692 A.2d 570, 576 (Pa.Super.1997).

76. I conclude Villei has failed to prove the second and third elements. Third party defendants knew of Villei's contacts throughout the banking world; in fact, this was the reason that they had originally contacted and contracted with Villei. *See* Finding of Fact, supra. ¶¶ 12–13. I conclude that Villei presented no persuasive evidence that the third party defendants ever acted with the purpose of causing damage to these banking relationships; indeed, the record reveals that the Taubman wanted to maintain and expand Villei's banking connections in order to use them at the time and in the future to close these types of transactions.[5] *See* Finding of Fact, supra, ¶ 12–13, 38–40. Thus, I conclude that the third party defendants did not intentionally interfere with Villei's ongoing business and contractual relationships by breaching the trust agreement or by attempting through Villei to engage in potentially criminal misconduct in the sale of prime bank guarantees.

### E. Punitive Damages

77. Under Pennsylvania law, punitive damages "are appropriate when the act committed, in addition to causing actual damages, constitutes 'outrageous conduct' either through reckless indifference or bad motive." *Donaldson v. Bernstein,* 104 F.3d 547, 557 (3d Cir.1997) (applying Pennsylvania law). As explained by the Supreme Court of Pennsylvania, three factors are to be considered in awarding punitive damages: 1) the character of the act; 2) the nature and extent of the harm, and 3) the wealth of the defendant. *See Kirkbride v. Lisbon Contractors, Inc.,* 555 A.2d 800, 802–03 (Pa.1989).

78. I conclude that Villei has not presented persuasive evidence that the acts of the third party defendants constituted outrageous conduct either through reckless indifference or bad motive. Villei presented no persuasive evidence to support his contention that the third party defendants outrageously slandered Villei's reputation to other banks and members of the business community including James Sharp and Ken Schlessinger. Villei contends that his request for $500,000 in punitive damages constitutes but a small percentage of the fees the third party defendants gained from these transactions; however he presented no evidence that the third party defendants collected any fees from these transactions. Accordingly, I conclude that punitive damages are not warranted in this case.

### III.  VERDICT

Having concluded that Villei is entitled under the indemnity clause of the Trust Agreement to recover attorney's fees and settlement costs from the litigation arising from performance of the Trust Agreement, my verdict is in favor of Villei and against AAI on Villei's claim of indemnification under the Trust Agreement in the amount of $106,-891.57.

Having concluded that Villei failed to present persuasive evidence to support his claims

---

5. The record reveals that Taubman told a business associate of Villei, James Sharp, that Villei had absconded funds from him. *See* Finding of Fact, supra, ¶ 47. However, Villei failed to present the Court with any evidence that he suffered any loss or damage from this statement by Taubman. Thus, I conclude that this contact with James Sharp was not a tortious interference with contract.

for breach of the Trust Agreement, fraudulent and negligent misrepresentation, tortious interference with contract, or punitive damages, my verdict is in favor of the third party defendants on these claims.