THE BROTECH CORPORATION t/a
Purolite Company, Appellant,

v.

DELMARVA CHEMICALS, INC.,
GFI, Inc. and GFI Chemicals
LP, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 19, 2002.
Filed July 30, 2003.
Reargument Denied Sept. 30, 2003.

Suzanne I. Schiller, Philadelphia, for appellant.

Anita B. Weinstein, Philadelphia, for appellees.

Before: DEL SOLE, P.J., KLEIN and CAVANAUGH, JJ.

DEL SOLE, P.J.

¶ 1 Brotech Corporation appeals from the trial court's order granting summary judgment in favor of Appellees. Upon review, we reverse.

¶ 2 Brotech is a manufacturer of cation exchange resins which are used in the water treatment process. Caustic soda is an ingredient used in the manufacture of the resins. Appellees are vendors of caustic soda. Brotech purchased caustic soda from Appellees for use in manufacturing its products.

¶ 3 In 1998, Brotech's customers began returning resins to Brotech, complaining that they were generating a musty odor which made the resins unacceptable for water purification purposes. Brotech investigated the complaints and determined that the cause of the odor was the presence of organic materials which it believed could only have been introduced by the caustic soda provided by Appellees. Brotech contacted Appellee Delmarva, notifying it of the problem and asking Delmarva to conduct its own investigation. Delmarva conducted its own investigation. Although there is some dispute regarding how much, the record indicates that Delmarva reclaimed at least some of the remaining caustic soda sold to Brotech.

¶ 4 Brotech has a policy of taking samples of the resins it ships to its customers and retaining these samples for two years. Additionally, any samples of resin returned from customers are stored with the retained resins for the same two-year period.

¶ 5 In August 1999, Brotech filed suit against Appellees for breach of contract and for breach of implied warranties. Brotech alleged that Appellees delivered contaminated or impure caustic soda, resulting in manufacturing and production difficulties and giving rise to damages. Appellees filed a motion for summary judgment based upon the spoliation of evidence doctrine.

¶ 6 Through discovery, Appellees requested that Brotech produce samples of the resins. Brotech advised Appellees that it no longer possessed the sample resins, based on its two-year retention policy. Subsequent to Appellees' filing of their motion for summary judgment, Brotech discovered that it did indeed possess the pertinent resin samples. Brotech's counsel notified Appellees of this discovery. Brotech filed a response in opposition to Appellees' motion for summary judgment, and advised the court that the evidence Appellees were seeking was discovered.

¶ 7 Shortly thereafter the trial court granted the motion for summary judgment. Brotech filed its notice of appeal on November 11, 2001. On December 12, 2001, the trial court denied Brotech's emergency motion for reconsideration. Pursuant to the court's order, Brotech filed a concise statement of matters complained of on appeal.

¶ 8 On appeal, Appellant presents the following issues:

1. As a matter of law, does the doctrine of spoliation of evidence apply in actions where the evidence in question is available for testing and/or sampling by the moving party?

2. Can summary judgment be granted under the spoliation of evidence doctrine when the evidence upon which the motion is based is available for testing and/or sampling by the moving party?

3. As a matter of law, does the doctrine of spoliation of evidence apply in actions where the evidence in question is *not* the evidence which is alleged to be defective?

4. Can summary judgment be granted under the spoliation of evidence doctrine where the evidence upon which the motion is based is *not* the evidence which is alleged to be defective?

5. Was dismissal of the action, the harshest sanction possible, an appropriate sanction and/or remedy for Plaintiff's delayed discovery of the evidence?

Appellant's Brief at 5.

¶ 9 We have held that:

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.... In determining whether to grant summary judgment a trial court must resolve all doubts against the moving party and examine the record in a light most favorable to the non-moving party. Summary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law.

*Piluso v. Cohen*, 764 A.2d 549, 550 (Pa.Super.2000). On an appeal from a grant of summary judgment, a reviewing court must examine the record in a light most favorable to the nonmoving party, accepting as true all well-pleaded facts and giving that party the benefit of all reasonable inferences which can be drawn from those facts. *Hoffman v. Brandywine Hosp.*, 443 Pa.Super. 245, 661 A.2d 397 (1995). The Superior Court will reverse a grant of summary judgment only when the trial court has committed an error of law or

abused its discretion. *Butterfield v. Giuntoli*, 448 Pa.Super. 1, 670 A.2d 646 (1995).

¶ 10 Rule 1035.3 of the Pennsylvania Rules of Civil Procedure requires the non-moving party to file a response to a motion for summary judgment within thirty days after service of the motion. In this case, Appellant complied and filed its response to Appellees' motion for summary judgment. In that response, Appellant stated that after an additional search the sought-after resins had been discovered. The trial court was required to consider this information.

¶ 11 In *Gerrow v. John Royle & Sons*, 572 Pa. 134, 813 A.2d 778 (2002), Gerrow sought damages for serious personal injuries. After the discovery deadline had passed, one of the Appellants filed a motion for summary judgment on the basis that Gerrow could not establish a *prima facie* case. 813 A.2d at 780. Gerrow filed a timely response which had attached several expert reports which were sufficient to make out a *prima facie* case. *Id.* The Supreme Court held that the reports could be considered and that Rule 1035.3 permitted supplementation of the record. *Id.* at 781–782. Thus, the Supreme Court ruled that summary judgment was inappropriate. *Id.*

¶ 12 In this case, Appellant stated in its response to Appellees' motion for summary judgment that the resins at issue had been discovered. This additional evidence nullifies Appellees' claim that there was spoliation of the evidence. The intent of summary judgment is not to eliminate meritorious claims that could be established by additional discovery or expert report. *Id.* at 781. Rule 1035.3 permits supplementation of the record. *Id.* Thus, this evidence should have been considered, in addition to other evidence of record, by the trial court. The trial court erred in

disregarding this evidence and granting Appellees' motion for summary judgment.

■ ¶ 13 Moreover, dismissal of this case was not appropriate as a sanction. While Appellant's counsel's behavior may have been less than desirable throughout the process, a sanction based on the discovery violations would not have been appropriate. The trial court was not presented with a motion for sanctions. As our Supreme Court held in *Wolloch v. Aiken*, 572 Pa. 335, 815 A.2d 594 (2002), this case cannot be approached as a discovery sanctions case in the absence of a motion for sanctions. Thus, the matter could not have been properly dismissed on this ground.

¶ 14 Moreover, there was no spoliation of evidence in this case. The basis of Appellant's claim is that Appellees provided it with defective caustic soda, and in so doing breached its contract and implied warranties. It appears from the record, including the report by Richard D. Ross, Appellees' expert, that Appellees had the opportunity to and did indeed test the caustic soda and materials from Appellant's tanks. Additionally, Appellees reclaimed at least some of the alleged defective caustic soda. Accordingly, Appellees had the opportunity to, and did in fact, investigate the claims and test the relevant substances.

■ ¶ 15 The spoliation of evidence doctrine is intended to further the public policy of protecting defendants who may be unable to prepare a defense after the destruction or loss of an allegedly defective product. *Schroeder v. DOT*, 551 Pa. 243, 710 A.2d 23, 27 (1998). Appellees have gathered information and evidence supporting its position that the caustic soda was not contaminated. Thus, the lately discovered resins are irrelevant. The spo-

liation doctrine does not apply here. Viewing the evidence in the light most favorable to the Appellant, we find that Appellees were not entitled to judgment as a matter of law because there was no spoliation of the relevant evidence.[1]

¶ 16 Order reversed. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 17 KLEIN, J. files a dissenting opinion.

## DISSENTING OPINION BY KLEIN, J.

¶ 1 I respectfully dissent from the majority view and would sustain Judge Tereshko's decision granting summary judgment.

¶ 2 The two reasons stated by Judge Tereshko for his decision show that this experienced trial judge not only did not abuse his discretion but acted wisely and properly.

¶ 3 1. The verification of the Answer to the Summary Judgment Motion is by counsel on information and belief. It is not on personal knowledge by any officer of Brotech. Pa.R.C.P. 1035.4 requires, among other things, personal knowledge of the affiant and a statement that the signer is competent to testify to the matters stated.

¶ 4 Moreover, this "Answer" to the Summary Judgment Motion based on spoliation contains no explanation as to why the resin was not "discovered" before, what efforts Brotech made to find it, and, perhaps more significant, how we know that this is the right batch of resin.

¶ 5 This is not a mere technical defect in a late-filed response to a summary judgment motion. First, there is nothing of

---

1. Because our resolution of these issues results in disposition of the case, we need not determine the remaining issues raised by Appellant.

record to explain why Brotech did not comply with the discovery rules and whether they are complying now. In view of multiple discovery violations by and sanctions against Brotech during the litigation, it is understandable that Judge Tereshko would fail to credit a statement made by counsel not verified by the party. Moreover, it was never ascertained whether the caustic soda that was produced and tested was the caustic soda in the offending resins or was just other soda that had been stored in a contaminated vat.

¶ 6 2. The "discovery" of the missing resin was more than two years after the complaint was filed, a year after the discovery request was made, and eleven days before the trial was scheduled to start. Under *Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp.*, 797 A.2d 269, 286 (2002) the refusal to allow the production of this evidence long after discovery had closed and just prior to trial was not an abuse of discretion. This late discovery would almost undoubtedly delay the trial. Under *Schroeder v. Commonwealth Department of Transportation,* 551 Pa. 243, 710 A.2d 23 (1998), Judge Tereshko's decision to grant summary judgment based on the spoliation doctrine was likewise appropriate.

### 1. Failure to file the Rule Requiring an Affidavit of Personal Knowledge.

¶ 7 Judge Tereshko in his opinion pointed out that a statement by a lawyer on information and belief is no substitute for an affidavit or similar statement by a party with personal knowledge. As Judge Tereshko noted, Pa.R.C.P. 1035.1 requires the "record" in motions for summary judgment to include "depositions, answers to interrogatories, admissions and affidavits." Under Pa.R.C.P. 1035.4, an affidavit "shall be made on personal knowledge..." No such affidavit was filed in this case.

¶ 8 This is not a mere technical violation. Judge Tereshko said in his Opinion that the "'11th hour discovery' of the alleged samples becomes highly suspicious in light of the volume of litigation attached to the prior discovery issues." There is a long history of court involvement to compel Brotech to carry out their obligation to provide discovery. That litigation includes:

7/26/00     Order compelling Plaintiff's answers to Defendant's First Discovery Requests (R.R. 67b–68b).

9/13/00     Order requiring Plaintiff to file Answers to Discovery (R.R. 96b–98b).

11/29/00     Order requiring Brotech to answer interrogatories and produce documents or file affidavits if they do not exist (R.R. 160b).

1/24/01     Order requiring depositions and deposition continuances of five witnesses and imposing sanctions in the amount of $2,000 (R.R. 433b–434b).

2/28/01     Order requiring the appearance of Plaintiff's witnesses for depositions and requiring payment of the $2,000 ordered on 1/24/01 within ten days (R.R. 416b–417b).

3/15/01     Consent Order where Brotech agrees to respond to various Supplemental Document Requests and certain Requests for Production, with others being withdrawn (R.R. 469b–470b).

4/18/01     Order requiring Brotech to pay a reduced amount of sanctions ($500) within two days.

¶ 9 It is with this background that Judge Tereshko refused to accept as an affidavit a statement of counsel on information and belief with nothing from counsel with personal knowledge. That decision is justified by the record. Therefore, Judge Tereshko acted properly, eleven days before the scheduled trial date, in refusing to allow the production of the alleged samples and the concurrent need to continue the trial when there is no legally proper evidence that they in fact exist.

¶ 10 While an affidavit from Brotech's production manager was filed on November 16, this was eleven days **after** the scheduled trial date, and merely says that the resin was discovered after "a more thorough and exacting search..." (R117–

119a). There is no abuse of discretion in failing to reconsider an order properly entered based on what was before the judge. Despite all the discovery requests and orders to find the resin, Brotech has still not given any valid reason **why** the evidence was not properly preserved so it could be located and **why** the "more thorough and exacting" search was not conducted earlier.

¶ 11 Brotech/Purolite claims that certain batches of resin were tainted by the caustic soda supplied Delmarva. This taint is allegedly in the form of certain organic compounds, namely: methyl ethyl ketone, 2–butanol and tetrahydrofuran. It is alleged that the presence of one, some or all of these compounds together produce a musty smell which is unacceptable in the water purification process. Therefore, any resin that produces such an odor is unacceptable to a purchaser and is returned.

¶ 12 Brotech/Purolite received complaints about a musty odor produced by its resin. They accepted returns from its customers. Brotech/Purolite has a policy of keeping samples of the resin it ships (retains), samples from returns (returns) and samples of the caustic soda for two years. The complaints at issue here are from 1997 and 1998. Sometime, no later than September 1998, Brotech/Purolite realized that there may have been a problem with the caustic soda and they took samples of the soda as well as retains and returns. It appears that these samples are at the core of the spoliation dispute.

¶ 13 During the course of discovery, Delmarva sought to test these samples. They were told, however, that the samples had been destroyed through the normal process of keeping such samples for only two years. Although a tank that contained caustic soda was apparently tested and found to be contaminated it is unclear if this testing was performed on soda that was used in the complained of batches of resin. Brotech/Purolite has apparently never kept accurate track of what particular batches of chemicals are used to produce what particular batches of resin. Therefore, it cannot be said with certainty that the substances tested were ever used in the product that smelled musty.

¶ 14 It remains that Brotech is claiming that a specific product was tainted by Delmarva supplied caustic soda. This is not a situation where one product is interchangeable with another, such as with an allegedly defective widget that all parties agree was manufactured in like manner to the widget in question. Each batch of resin is a discrete product of specific chemicals provided by specific supplies. One batch is not interchangeable with another.

¶ 15 One specific batch, unidentified by Brotech, is alleged to have caused a problem. Brotech had in its possession the materials used in that specific batch. Those materials are, to my mind, clearly relevant. While the defense expert has produced a report ostensibly vindicating Delmarva, that report is, by necessity, a general statement that cannot address the specific batch in question. Further, the defense expert Richard Ross, clearly avers that his efforts in this matter were substantially hampered by his inability to test the specific material in question.

¶ 16 With this in mind, I believe that it is particularly important to be able to test the actual product return to Brotech as well as the actual caustic soda used to make that resin.

¶ 17 The "evidence" suddenly produced and finally attested to *after* the ruling had been made still would not get beyond the spoliation problem. In relevant part, the affidavit of Joseph D'Alessandro, Production Manager for Brotech, states:

After the samples were requested in December, a search was made of the storage facilities and no samples were discovered. It was determined that, because the samples would have been produced over two years ago (in September and October 1998), Brotech would no longer have the samples.

Based upon this information I notified our previous attorney that we no longer had any samples.

Upon being notified by previous counsel that Defendants filed a Motion for Summary Judgment, Brotech conducted a more thorough and exacting search of its entire premises, in an attempt to determine whether, notwithstanding its two-year retention policy, any resin samples had been retained. During the search some resin samples were found mixed in with samples of contaminated caustic. I contacted our previous attorney and advised him of this discovery.

¶ 18 This is not a reliable affidavit. There is no indication how Brotech knew that the "samples" were the samples in question. There is no indication that the "samples" had been properly preserved and had not been contaminated through time. Indeed, the resin was allegedly located mixed in with contaminated caustic soda. Were the samples stored together as in actually in contact with each other, or does this mean that the resin and the caustic were in a box someplace each in its own sealed container? Why did it take until after a motion for summary judgment was filed for Brotech to conduct a "thorough and exacting search" of its premises? Brotech certainly knew that these samples were at the core of its dispute with Delmarva, yet apparently at no time during the entire litigation process or pre-litigation investigation, did Brotech ever test the very samples it complained of.

¶ 19 At the heart of Brotech's complaint is the allegation that Delmarva's caustic soda was tainted. Brotech took at least one sample of the soda. Why was it never tested? Instead, if we are to believe Brotech, this sample apparently sat somewhere on a shelf, while the firestorm of litigation raged. While motion after motion is filed against Brotech for discovery violations, this sample allegedly sits on a shelf with not one person in the entire company realizing what they had—namely the possibility of proof positive that Delmarva had provided them with tainted caustic soda. Then, only after the trial court has finally had enough, and has dismissed the complaint, does Brotech wake up, conduct a real search and tell the court "Oops, we had it all along." This is simply unacceptable.

¶ 20 The affidavit of John Dolan (unidentified as to title in the affidavit) is equally unenlightening. Mr. Dolan simply relates that at some time, someone tested some caustic soda and that soda was found to be contaminated with organic materials. The affidavit does not say what caustic was tested or when it was tested. The affidavit does not claim that it was caustic used to produce the returned resins that was tested. The affidavit does not say who tested the soda or by what method it was tested. Importantly, the affidavit has absolutely nothing to do with the recently "discovered" samples and caustic.

¶ 21 My reading of the record in this matter indicates that, affidavits or not, it is bereft of any indicia of reliability as to the caustic soda in question. As this soda is the center of the controversy, and as Brotech has produced nothing to indicate that it has the chemicals in question, I believe the trial court was correct in granting Delmarva's motion for summary judgment based upon spoliation.

¶ 22 Finally, I recognize that the record contains references to testing that was conducted on some sample taken from a tank at the Purolite plant. This sample was apparently obtained for a sludge clean out of a Brotech storage tank and the sludge transferred to a barrel of indeterminate origin. It is agreed to by all parties that the sample taken from this tank was tainted by some manner of organic material. The import of this is also in dispute.

¶ 23 The majority implies that this fact, the existence of tainted sludge (as well as the existence of the defense expert report), renders the spoliation issue moot. I do not agree. The motion before the trial court was on the issue of spoliation. If Brotech believed that it had sufficient evidence to render the existence of the resin and caustic soda in question moot, then it was incumbent on Brotech to provide that information. My review of the record does not indicate such an offer of proof. The sole expert report from plaintiff on this matter appears to be a letter from Irving Abrams, Ph.D. that states he has been told that Delmarva tested some caustic soda and found it to be contaminated with the organic compounds referenced above. Dr. Abrams then states that such organic compounds could generate an odor. There is nothing in this report to indicate the source of the information. There is no chemical analysis supplied. There is nothing, once again, to indicate what caustic soda was tested and whether the caustic soda tested was used to make the resin in question.

¶ 24 Brotech has also supplied a letter from Narvinder Sachdev, General Manager of Brotech/Purolite. This letter is dated February 5, 2001. In this letter Mr. Sachdev, a chemist, claims that he investigated the odor claims regarding the diaphragm caustic incident. He states that he smelled the resin in question, he smelled the same musty odor of the resins in samples of the caustic taken from "production when these contaminated resins were manufactured" and that a caustic tanker truck at Delmarva had the same musty odor. He therefore concludes based upon his experience with cation exchange resin manufacturing and his training and experience as a chemist that the Delmarva caustic soda caused the problem.

¶ 25 There is no indication as to how Mr. Sachdev came to know or believe that the Delmarva truck smelled musty, nor any indication that the truck in question ever delivered anything to Brotech. This gap, in and of itself, renders the opinion irrelevant.

¶ 26 However, this letter also indicates that Brotech knew, at some point in time,[2] the importance of the specific samples in question. The general manager of Brotech/Purolite himself claims to have smelled the samples. Yet the samples were not tested and were not made available to Delmarva for testing.[3]

---

**2.** Although the letter is dated February 2001, it is unclear when Mr. Sachdev actually smelled the samples in question. If this occurred in 2001, then it seems somewhat damning that Brotech then claimed the samples to have been destroyed. 2001 is well past the two-year self-imposed destruction date for these samples. If the samples were smelled in 1997 or 1998, then it still indicates that Brotech knew of the import of the samples yet still claimed that it allowed them be destroyed. The affidavits supplied by Brotech indicate that the materials were believed to be destroyed because no one told them not to. It seems particularly incredible that Brotech would have to be told by their attorneys not to destroy material evidence in an allegedly multi-million claim.

**3.** The majority notes that Delmarva reclaimed at least some of the caustic soda in question, implying that Delmarva should have done its own testing. When in the litigation process

¶ 27 The questions noted regarding the above only confirms my belief that that the specific material at issue is vitally important. Therefore, I cannot agree that spoliation issue is moot.

¶ 28 In essence, Brotech is asking the courts to allow it to proceed to trial on the inference that Delmarva supplied it with tainted caustic soda and that the tainted soda caused an odor that rendered the resin unusable. Brotech asks the courts to allow this in spite of the fact that Brotech had in its possession, from the time the complaints of a musty odor were made, samples of the resin shipped to its customers, samples of the resins returned by its customers and samples of the caustic soda used to make those resins. Brotech, however, did not test those samples. For the duration of the litigation process Brotech told Delmarva and the courts that the very samples at the heart of the matter had been thrown away and could not be tested. Only after a motion for summary judgment had been filed did Brotech finally claim that it found the samples. However, Brotech never supplied to the trial court any reliable or competent proof that the samples that had recently been discovered were in fact the samples in question. Only after summary judgment had been granted did Brotech supply affidavits regarding those samples. Even then the affidavits supplied were deficient.

¶ 29 Based upon my reading of this record, and the information available to the trial court at the time the motion was filed, I believe that the trial court properly concluded that there was never any evidence that the products requested in discovery had been produced, and therefore I would affirm the order of the lower court grant-

ing summary judgment under the spoliation doctrine for that reason alone.

**2. Sanctions for spoliation or violating the discovery order**

¶ 30 In fact, this is a two-fold process. If the resin has in fact been found, then its preclusion is appropriate for failing to produce it timely in discovery orders. Next, if the actual resin either does not exist (as Judge Tereshko opines as a possibility) or there is no excuse for its late production, it is necessary to turn to the spoliation motion. Delmarva's lack of the ability to test the allegedly defective product prevents it from investigating to see whether the smell came from any other cause, or even if the product was defective.

¶ 31 In general, "the decision whether to sanction a party for a discovery violation and the severity of such a sanction are matters vested in the sound discretion of the trial court. We will not reverse a trial court's order imposing such a sanction unless the trial court abused its discretion." *Luszczynski v. Bradley,* 729 A.2d 83, 87 (Pa.Super.1999) (citations omitted); *See also, Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp.,* 797 A.2d 269, 286 (2002).

¶ 32 As noted in *Pioneer,* our courts have set forth a five point test to consider whether the sanction is appropriate. While preclusion is short of dismissal, in many cases it has the same effect and in those circumstances should only be applied when the violation is willful and the opposing party has been prejudiced. *Stewart v. Rossi,* 452 Pa.Super. 120, 681 A.2d 214, 217 (1996).

¶ 33 Those five points, and how the apply in the instant case, are as follows:

this reclamation occurred is unclear; it may have happened well before suit was filed. Delmarva did admit in answers to interrogatories that it did reclaim some of the caustic

soda and resold it to other customers. There is no indication of any subsequent complaints regarding the product.

*(1) The nature and severity of the discovery violations.* Here, the very product involved in the plaintiff's complaint cannot be produced. This is not some tangentially relevant document—it is the very product the plaintiff claims was defective and cost them huge amounts of money.

*(2) The defaulting party's willfulness or bad faith.* In this case, to this date there has never been an explanation as to **why** the critical products in this case were lost or misplaced. A two-year product retention policy is no excuse when the party is the one bringing the lawsuit, claims the product is defective, and knows the case is going to suit. If a lawyer did not properly instruct the company to maintain the evidence, that likewise is no excuse. If for no other reason Brotech's failure to explain why for two years they "misplaced" the critical evidence in the case is sufficient to grant preclusion.

*(3) Prejudice to the opposing party.* Even should this resin exist, everything was set for trial within two weeks. It would be prejudicial to defendant to have to reschedule all the witnesses. This is not a minor injury intersectional accident. The claim apparently was for more than $4 million in damages. Moreover, at this late date it may be impossible for Delmarva to check to make sure this is actually the resin that was part of the allegedly defective batch. This also constitutes prejudice.

*(4) The ability to cure the prejudice.* Perhaps Delmarva can get an expert evaluation of the product, re-prepare all of its witnesses, and try the case several months later. However, there is no way they can assure themselves that this is the actual product that part of the batch sent to customers and returned. Merely "finding" a batch of resin does not establish a chain of custody. There is no showing as to how Brotech can be sure this is the right batch many months later.

*(5) The importance of the precluded evidence in the light of the failure to comply.* The evidence is important. It is important to both sides. Failing to preserve what is probably the most important key evidence until the eve of trial without explaining why it could not be found previously is of the highest importance to Delmarva as well as Brotech.

¶ 34 As noted above, this is not an isolated violation of discovery rules. In addition to the seven orders against Brotech for discovery violations, the record show innumerable informal requests for discovery. In view of this history and the "discovery" of the missing resin so late it would compel a delay in the trial, it is inappropriate to hold that Judge Tereshko abused his discretion by ruling on the spoliation motion without reopening discovery and delaying the trial.

¶ 35 Judge Tereshko did not abuse his discretion when he held that he would not countenance the late production of the alleged resin. I believe this sanction was appropriate (a) because of the failure to supply a proper verification as to what was found; and (b) because of multiple violations of discovery rules in the past and prejudice to Delmarva in the delay of the trial and the inability to make sure this is actually from the batch of resin that is claimed to be defective.

¶ 36 Therefore, it becomes necessary to examine the decision granting summary judgment based on spoliation. I believe Judge Tereshko was correct in imposing a sanction precluding Brotech from claiming the resin was defective. In *Schroeder v. Com., Dept. of Transp.*, 551 Pa. 243, 710 A.2d 23 (1998), the Pennsylvania Supreme

Court adopted the spoliation test set forth by the Third Circuit Court of Appeals. It is similar to a preclusion test for discovery violations. The *Schroeder* court said:

> In deciding the proper penalty for the spoliation of evidence, the Third Circuit found relevant (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) the availability of a lesser sanction that will protect the opposing party's rights and deter future similar conduct.

¶ 37 Unlike the facts in *Schroeder*, I believe Judge Tereshko acted properly in granting Delmarva's spoliation motion. His opinion aptly lays out the reasons for his decision.

> Here, Appellant [Brotech] failed to adhere to its own minimum two-year retention policy for resin samples and instead attempts to lay blame of appellees [Delmarva] for waiting until the litigation was well under way to request the samples. The resin samples were under the exclusive control of appellant and therefore, appellant, in order to proceed with its case, was obligated to preserve the samples as evidence. Appellant was not even able to provide the identity of the batches or resins that were returned by its clients. Appellant's verified answer was "Unknown. No records were kept of the returns." *See* Defendant's Motion for Summary Judgment, Exhibit "G", Plaintiff's Verified Response to Defendants' Second Set of Supplemental Interrogatories and Document Requests addressed to Plaintiff, No. 2. Furthermore, plaintiff was unable to produce samples of the specified resins manufactured in 1998 and 1999, stating that the "samples discarded as part of the standard two-year retention policy so they no longer exists

except possibly for 1999 that will be produced." See, Id., No. 27.

¶ 38 The fact that some of the caustic soda was produced does not cure the prejudice, since that had been stored for a long period of time at Brotech and could have been contaminated after it was shipped by Delmarva.

¶ 39 I find no abuse of discretion and would affirm Judge Tereshko's ruling granting summary judgment based on spoliation.