**Busy Bee Inc. v. Corestates Bank N.A.**

498

C.P. of Lackawanna County, no. 97 CV 5078.

*Steven M. Coren,* for plaintiff.
*Joan R. Sheak,* for defendant.

NEALON, *J.,* August 9, 2004—In this lender liability suit, the defendant Bank has filed a motion for partial summary judgment seeking to dismiss the borrowers' claims for fraudulent and negligent misrepresentation. The summary judgment materials demonstrate that there are genuine issues of material fact whether (a) the Bank possessed the requisite intent so as to be chargeable with fraud and (b) the borrowers justifiably relied upon the Bank's fraudulent misrepresentation. Furthermore, since the Bank arguably supplied false information for the guidance of the borrowers and had reason to foresee economic harm to the borrowers as a result of their reliance upon any negligently provided information, the borrowers' claim for negligent misrepresentation is not barred by the economic loss doctrine. Thus, for the reasons set forth below, the Bank's motion for partial summary judgment will be denied.

## I. FACTUAL BACKGROUND

Plaintiffs Busy Bee Inc., Baby Bee Inc., MLL Corp. and Jasami Inc. t/a Century Shoes Ltd., and Carlton Shoes

Ltd. t/a BLS Associates (collectively referred to as B. Levy) seek more than $39 million in compensatory damages and an unliquidated sum of punitive damages from defendant Corestates Bank N.A., as successor by merger to the Third National Bank & Trust Co. of Scranton (Bank), for allegedly causing B. Levy's bankruptcy. B. Levy's claims are predicated upon the Bank's conduct in connection with a loan agreement and line of credit which provided working capital to finance B. Levy's wholesale and retail shoe business. The Bank has filed a motion for partial summary judgment requesting the dismissal of B. Levy's claims for fraudulent and negligent misrepresentation.

Examining the summary judgment materials in the light most favorable to B. Levy as the non-moving party, see *Wilkes v. Phoenix Home Life Mutual Insurance Co.,* 851 A.2d 204, 210 (Pa. Super. 2004), the record reflects that on November 14, 1994, B. Levy and the Third National Bank & Trust Co. of Scranton executed a "Loan agreement—Revolving line of credit," pursuant to which the Bank extended a $6,500,000 line of credit to B. Levy and its wholly-owned subsidiary, Shoeteria Inc. (See dkt. entry no. 62, exhibit A.) The line of credit was to "be utilized for working capital, acquisition of inventory, general corporate purposes, and to pay off existing lines of credit, and for the issuance of Bank letters of credit for the purchase of inventory" for B. Levy's wholesale and retail operations. (*Id.,* p. 2.) Article 1, section 1.03 of the agreement governs the renewal of the parties' line of credit and states that "[t]he loan is a continuing credit facility; however, it is subject to annual review by May 31 of each year (anniversary date), by Bank, who, in its

sole discretion, may continue to offer this loan for each subsequent year." (*Id.*, p. 8.)

As security for the loan, B. Levy granted the Bank first lien security interests in its inventory, marketable securities, accounts receivable and bills of lading.[1] (*Id.*, pp. 9-11.) Section 5.02 of the agreement provides "that until payment in full of the obligation provided for herein," B. Levy "will not, without the prior written consent of the Bank, which consent shall not be unreasonably withheld . . ., operate [B. Levy's] business other than in the normal and customary course." (Dkt. entry no. 62, exhibit A, p. 23.) Of particular significance for purposes of the Bank's motion for partial summary judgment, section 6.01 identifies "events of default" as including:

"(b) If either of the borrowers or any guarantor *shall apply for or consent* to the appointment of a receiver, or a trustee or *to liquidation* of itself or *of all or substantial part of its assets,* or admit in writing its inability to pay its debts as they fall due, make a general assignment for the benefit of its creditors, be adjudicated as bankrupt or insolvent, or file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement with creditors, or to take advantage, as debtor, of any insolvency law or file any answer admitting the material allegations of a petition filed against it in any bankruptcy, reorganization or insolvency proceeding, *or take any corporate action for the purpose of effecting*

---

1. B. Levy also pledged property that it owns at 700 North South Road, Scranton, as security for the Bank's loans by executing an "open end collateral mortgage." See *Corestates Bank v. Levy Brothers Co.,* no. 98 CV 1158 (Lacka. Cty.).

*any of the foregoing." (Id.,* pp. 24-25). (emphasis added) In that regard, section 3.02 states that the "Bank reserves the right to decline issuance of any letters of credit if . . . there exists an event of default . . . ." (*Id.,* p. 18.)

B. Levy and its affiliated shoe enterprises were owned and operated by members of the Levy family and had been engaged in the wholesale and retail shoe business since the late 1800s. In 1994-1995, poor market conditions caused B. Levy's retail business to experience financial difficulties. As a result, B. Levy made a strategic decision in April 1995 to change the format of certain retail stores to discount stores in an effort to increase revenues, lower expenses and improve profitability. After B. Levy advised the Bank's vice president, Frank Heston, regarding its intentions, B. Levy converted two of its 17 retail stores to discount "Brands for Less" outlets in August 1995. (*Id.,* no. 68, exhibit C, pp. 356-62, 366-68.) On August 4, 1995, Corestates Bank, as the successor by merger to the Third National Bank & Trust Co. of Scranton, renewed the $6,500,000 line of credit which was to "mature on May 30, 1996, and . . . be renewable at that time at the option of the Bank . . . ." (*Id.,* no. 62, exhibit 2, p. 1.)

In August and early September 1995, B. Levy's principals sold marketable securities totaling $1,275,620.34 and used the proceeds from those stock sales to satisfy the $1,000,000 term loan issued by the Bank in conjunction with the line of credit. (*Id.,* no. 68, exhibit E.) According to an internal memorandum authored by Mr. Heston as the Bank's vice president, B. Levy and Shoeteria characterized this "sale of marketable securities as evidence of their commitment." (*Id.,* exhibit D, p. 1.) By October

1995, the conversion of two retail stores to a discount format had proven to be a "strong success" with sales increasing by 24 percent at the first store and 6.5 percent at the second outlet. Corresponding reductions in advertising and personnel expenses for the discount stores "substantially improved" B. Levy's profit margins with the new format. Mr. Heston "was elated" with the sales and operating reports for the two discount stores and "expressed his support" for B. Levy's conversion strategy. When Mr. Heston inquired whether B. Levy intended to convert more retail stores to discount outlets, B. Levy indicated "that if their success continued, [B. Levy] would plan to convert more stores to that concept." (*Id.,* exhibit C, pp. 363-64, 369-71; exhibit D; exhibit G.) During a subsequent meeting with Mr. Heston in November 1995, B. Levy representatives officially informed the Bank of "the plan to convert four more stores to this [discount] concept next month, including the two Scranton stores, which have been hurt by the Steamtown Mall, along with the Kingston and remaining Wilkes-Barre store." (*Id.,* exhibit H, p. 2.)

On December 22, 1995, representatives of B. Levy and the Bank met to discuss the financial condition of B. Levy's operations, particularly its retail sales division, and to provide a status update on the conversion of selected retail stores to the discount outlet format. The Bank's internal memoranda concerning that meeting indicate that B. Levy "continue[d] to lose money in [the] continuing poor retail climate" and that "[w]hile wholesale revenues reflect an $838M improvement with a $250M operating profit, the retail division continues to lag." (*Id.,* exhibit K, p. 1.) Bank records memorialize that B. Levy representatives referenced "their commit-

ment to the company's future, citing last year's $500M capital injection and this year's sale of marketable securities, along with plans to vacate and sell/lease the 53,000 sq. ft. headquarters and downsize the operation into the approximate 15,000 sq. ft. Penn Avenue location." (*Id.,* exhibit I, p. 1.) In response, the Bank's senior credit officer, Robert Spencer, advised B. Levy that the Bank did not endorse the new discount store concept and instead "wanted [B. Levy] to get out of the retail business" since the Bank's economist had opined "that there would be a continuous downturn in the retail environment." Mr. Spencer further informed B. Levy that the Bank would continue to provide financing for B. Levy's wholesale operations only if it terminated its retail business. (*Id.,* exhibit C, pp. 375-87; exhibit J, pp. 37-40.)

Following the parties' meeting on December 22, 1995, Benjamin Levy contacted his brothers, Robert S. Levy and Irwin Levy, to advise them of the Bank's insistence that B. Levy "liquidate the retail business" in order for the Bank to provide continued financing for B. Levy's wholesale business beyond the line of credit's anniversary date of May 31, 1996. (*Id.,* exhibit B, pp. 85-89; exhibit L, pp. 58-69; exhibit O, p. 105.) Unbeknownst to B. Levy, the Bank reportedly intended as early as December 27, 1995, to discontinue B. Levy's line of credit *prior* to the May 31, 1996 anniversary date. In his internal memorandum dated December 27, 1995, Mr. Heston discussed B. Levy's retail sales woes and remarked that the Bank's "staying in the line [of credit] facility will hinge upon the Levy's willingness to support the company, the reasonableness of their projection and acceptance of our requirement of an independent financial consultant going forward." (*Id.,* exhibit K, p. 1.) Mr.

Heston expressly stated in his memo that the Bank "would then look to exit, preferably prior to the [credit] facility's May 31, 1996 expiration." *(Id.)*

Despite their emotional attachment to their family's long-standing retail business, the B. Levy brothers begrudgingly agreed to liquidate their retail operations as per the Bank's demand. *(Id.,* exhibit B, pp. 88-89; exhibit L, pp. 59-60, 62-67.) In a letter to Mr. Heston dated January 11, 1996, B. Levy outlined its plan to "liquidate [its] retail business" in an effort to "substantially reduce the amount of indebtedness due the Bank over a reasonable period of time," and stated:

"(1) Commence a liquidation of all retail operations on or about March 1, and anticipate a 90-day program expected to result in a reduction of the indebtedness due the Bank by approximately $2.5 million by the end of June.

"(2) Operate several liquidation stores for the remainder of 1996 to reduce the indebtedness further by an additional $500,000 to $1,000,000 by the end of the year.

"This program is in addition to the positive actions taken during 1995 whereby the indebtedness due the Bank was reduced by approximately $1,200,000 and the partners invested an additional $500,000 in the business.

"All of the above represents a realistic plan to reduce the indebtedness due the Bank by the end of the year to approximately $1.5 million. I am preparing projections to show that our wholesale business will continue to be profitable, and I would expect that the Bank would commit to an adequate banking facility so that the 108-year-old wholesale business, the oldest privately owned business in the United States, can continue." (Exhibit M, p. 1.)

At the conclusion of a follow-up meeting between the parties on January 12, 1996, the Bank recommended that B. Levy retain a liquidation consultant to assist with the retail liquidation. (*Id.,* exhibit N.) However, at no time during the meeting did the Bank indicate that it did not consent to B. Levy's retail liquidation plan under section 5.02 of the line of credit agreement or that it might regard such a liquidation as an "event of default" under section 6.01(b). (*Id.,* exhibit O, pp. 121-22.)

To the contrary, Bank reports reflect that Bank representatives met with B. Levy principals again on January 16, 1996 "to let the Levy's know that [the Bank] certainly agreed in general and supported their plan" for liquidation of the retail business. (*Id.,* exhibit P.) At that time, the Bank and B. Levy "agreed that the general plan made sense," although B. Levy expressed concerns about "the need to negotiate with various landlords, some of which had quite some time remaining on their leases" for properties that B. Levy rented for its retail stores. (*Id.*) The Bank urged B. Levy to hire a liquidation consultant and even provided the name of a liquidation consultant that it had worked with on a prior liquidation. (*Id.,* exhibit C, pp. 396-400.) On January 18, 1996, the Bank forwarded a letter to B. Levy confirming the retail liquidation plans and acknowledging that B. Levy's liquidation of its retail division "must have been a very difficult decision and one which could only have been made after considerable thought and planning." (*Id.,* exhibit Q.) The Bank did not voice any objection to the proposed liquidation, nor did it suggest that the liquidation could conceivably be considered an "event of default."

In fact, Bank documents from February 1996 reflect the Bank's endorsement of the retail liquidation plan and

its intent to continue financial support for the wholesale operations during the liquidation. As per an internal memorandum of February 6, 1996, B. Levy contacted the Bank on that date "to provide an update on the status of [B. Levy's] plan for the liquidation of the retail business and to report on [its] progress towards meeting [the Bank's] desire for a complete and accurate financial plan for the liquidation." (*Id.,* exhibit R.) By that date, B. Levy had retained the liquidation consultant recommended by the Bank and was negotiating with landlords to prematurely terminate leases for their retail sites. (*Id.,* exhibit C, pp. 405-408.) The Bank advised B. Levy that the line of credit for the wholesale business "would remain open through the liquidation" of the retail division, (*Id.,* exhibit R), which liquidation was expected to extend "through the remainder of 1996" according to Bank reports. (*Id.,* exhibit N.) Once again, no indication was given by the Bank that liquidation of B. Levy's retail business would be deemed an "event of default," nor did the Bank reveal its apparent intention "to exit" the line of credit facility prior to May 31, 1996.

In reliance upon the Bank's approval of the retail liquidation plan, B. Levy took several measures in furtherance of the liquidation of its retail division. First, as noted above, B. Levy retained and paid the liquidation consultant that had been recommended by the Bank. Second, B. Levy terminated several leases for its retail stores and received correspondence from landlords confirming those terminations and the early termination charges being assessed by the landlords. Third, B. Levy cancelled scores of retail merchandise orders that had been placed with its retail stores' suppliers. Fourth, it informed more than 100 of its retail store employees that it was liqui-

dating its retail operations so that those employees could seek other employment. Fifth, B. Levy prepared and mailed notices of the private liquidation sales to its preferential customers. (*Id.,* exhibit C., pp. 405-409, 556-60; exhibit J, pp. 155-56; exhibits S, T, U and AA.) Parenthetically, it bears noting that throughout the month of February 1996, B. Levy continued to make payments towards its line of credit balance. (*Id.,* exhibit V.)

Forty-nine days after B. Levy had confirmed its retail liquidation plan in writing on January 11, 1996, and despite the Bank's express endorsement of the liquidation plan, the Bank forwarded a letter to B. Levy on February 29, 1996, providing B. Levy with "formal notice that you are in default of your obligations to the Bank under the loan documents evidencing the above-referenced loans as a result of . . . your plan to liquidate your retail operations." The Bank stated that "[a]s a result of the default, the Bank [was] no longer obligated to make further advances under the line of credit, and ha[d] the right to decline any requests for the issuance, renewal or extension of letters of credit." (*Id.,* exhibit X.) It is undisputed that following the Bank's declaration of a default under section 6.01(b) of the agreement, the Bank did not advance any more funds to B. Levy under the line of credit arrangement. (*Id.,* exhibit W, pp. 25-26.) Thus, by treating B. Levy's retail liquidation as an "event of default" under the agreement, the Bank was able "to exit . . . prior to the [credit] facility's May 31, 1996 expiration" as per its apparent statement of intention in its internal memorandum dated December 27, 1995. (*Id.,* exhibit K.)

Bank representatives have conceded that prior to the declaration of default on February 29, 1996, the Bank never advised B. Levy that it did not consent to the retail

508

liquidation under section 5.02 or that liquidation of its retail division would be treated as a default pursuant to section 6.01(b). (*Id.,* exhibit O, pp. 155, 157-58; exhibit W, pp. 62-63.) It is also uncontested that B. Levy was current on its monthly loan payment obligations to the Bank as of February 29, 1996. (*Id.,* exhibit O, p. 162.) By the time that B. Levy received the Bank's letter of February 29, 1996, the liquidation of its retail operations was an irreversible process since B. Levy had already terminated its retail store leases, cancelled merchandise orders for its retail stores, and taken other steps to consummate the liquidation. (*Id.,* exhibit C, pp. 556-57; exhibit J, pp. 155-56.) Moreover, when B. Levy inquired whether the Bank "wanted [B. Levy] to turn [the retail liquidation] around and go back to [B. Levy's] original plans" of following B. Levy's receipt of the February 29, 1996 letter, Mr. Heston "said no."[2] (*Id.,* exhibit C, p. 556.)

B. Levy maintains that the Bank declared a "sham" default after B. Levy "implemented the very restructuring plan induced, authorized, encouraged and approved by [the Bank], notwithstanding that [B. Levy] was current on its debt service payments and was not in default of its loan obligations." (*Id.,* no. 12, ¶¶42-45.) B. Levy argues that the Bank's approval of B. Levy's retail liquidation plan and subsequent declaration of a default based

2. Section 7.02(b) of the line of credit agreement required the Bank to promptly provide B. Levy "with notice of the occurrence of an event of default" and afforded B. Levy "30 days after receipt of such a notice . . . in which to remedy such event of default satisfactory to Bank." (*Id.,* exhibit A, p. 28.) B. Levy submits (a) that the retail liquidation was irreversible as of February 29, 1996, since the Bank waited 49 days to object and (b) that the Bank rejected its offer to cure the alleged default by attempting to reverse the liquidation process.

upon that liquidation were merely "part of a ruse and subterfuge to call and terminate the loan several months before it was actually due." (*Id.*, ¶44.) To that end, the Bank assumed control of B. Levy's available cash following the purported default and allegedly used the proceeds from the retail liquidation to prematurely pay down the loans. At the same time, the Bank did not provide the line of credit financing necessary for B. Levy's wholesale operations and B. Levy was unable to purchase inventory for its wholesale business. As a consequence, B. Levy was forced to declare bankruptcy on July 27, 1996. (*Id.*, no. 62, exhibit 7, pp. 4-5.)

On October 27, 1997, B. Levy commenced this litigation against the Bank asserting breach of contract and duty of good faith (Count I), fraudulent and negligent misrepresentation (Count II) and breach of fiduciary duty (Count III). (*Id.*, nos. 1, 12.) B. Levy's economic expert, Morris Gocial C.P.A., Cr.F.A., of Gocial Gerstein LLC, has calculated the damages attributable to B. Levy's loss of its retail and wholesale operations as totaling $39,350,490. (*Id.*, no. 62, exhibit 7, p. 20.) Approximately four months after B. Levy filed this suit, the Bank instituted a mortgage foreclosure proceeding against B. Levy with respect to the 700 North South Road property that was pledged as collateral for the loan. (See *Corestates Bank v. Levy Brothers Co.*, 98 CV 1158 (Lacka. Co.).) In its statement of claim that was filed in the mortgage foreclosure action on November 9, 1998, the Bank alleged that it is owed $429,792.44 in principal and $143,887.34 in interest and fees for a total of $573,679.81.[3] (*Id.*, no. 22.)

3. The mortgaged property has been leased to Allied Healthcare Services Inc. pursuant to renewable five-year leases and has been appraised by the parties as having a fair market value ranging between

B. Levy asserts in this lender liability action that the Bank is chargeable with fraudulent misrepresentation since: it insisted that B. Levy liquidate its retail operations and later facilitated that liquidation even though the Bank intended to declare a "sham default" on that basis so that it could "exit" the credit facility before May 31, 1996; it declared a nonexistent loan default as a pretext for discontinuing B. Levy's borrowing capability and seizing control of B. Levy's available cash to pay down a Bank loan that was not yet due; it induced the liquidation of B. Levy's retail business by representing that it would continue to finance B. Levy's profitable wholesale operations only if it liquidated its retail division; and it concealed its true intention to exit the credit facility before the line of credit's anniversary date of May

---

$1.7 million and $2.5 million. The parties' "open end collateral mortgage" contained an assignment of rents clause in the event of a default by B. Levy, and on April 7, 1998, the Bank advised Allied that it "may be liable to [the Bank] for any rent payments made to Levy after [its] receipt" of the Bank's invocation of the assignment of rents clause. (*Id.,* no. 19, exhibit B.) After Allied intervened and sought to interplead its rental payments into court, we issued an order on October 5, 1998, directing Allied to deposit its monthly rental payments with the clerk of Judicial Records to be held in an interest bearing escrow account pending resolution of the parties' dispute. (*Id.,* no. 14.) As a result of Allied's rental payments from October 1998 through December 2003, the balance of the escrow account grew to $768,897.09. Since the fair market value of the mortgaged property and the balance of the escrow account were more than triple the revised amount ($768,897.09) which the Bank alleged that it was owed on the collateral mortgage, we granted B. Levy's motion to modify the order of October 5, 1998, and directed that all monthly rental payments made after December 31, 2003, were to be distributed directly to the Levy family members who are the lessors on the Allied lease. See *Corestates Bank v. Levy Brothers Co.,* no. 98 CV 1158, Nealon, J., at pp. 9-10 (Lacka. Cty. Dec. 16, 2003).

31, 1996. In its partial summary judgment motion, the Bank contends that B. Levy cannot possibly establish the "justifiable reliance" element of a fraud claim since section 6.01(b) of the parties' agreement clearly notified B. Levy that it would be declared in default if it applied for or consented to "liquidation . . . of all or substantial part of its assets." (See no. 97 CV 5078, dkt. entry no. 63, pp. 10-13.) The Bank also avers that its alleged actions constitute nothing more than a breach of a promise to do something in the future, and as such, B. Levy cannot demonstrate the intent or *scienter* necessary for a cause of action in fraud. (*Id.,* pp. 13-15.) Last, the Bank argues that B. Levy's negligent misrepresentation claim is barred by the economic loss doctrine. (*Id.,* pp. 16-17.) We will address the Bank's arguments in the order in which they have been raised.

## II. DISCUSSION

### (A) *Standard of Review*

Summary judgment is appropriate where the pleadings, discovery, record admissions, and affidavits demonstrate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Porro v. Century III Associates,* 846 A.2d 1282, 1284 (Pa. Super. 2004); *O'Brien v. Ohio Casualty Insurance Co.,* 105 Lacka. Jur. 60, 62 (2004). "A proper grant of summary judgment depends upon an evidentiary record that either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a prima facie cause of action or defense." *Noel v. First Financial Bank,* 855 A.2d 90, 92 (Pa. Su-

per. 2004). In making that determination, the record must be viewed in the light most favorable to the non-moving party, with all doubts as to the existence of a genuine issue of material fact being resolved against the moving party. *Meyers v. Volvo Cars of North America Inc.,* 852 A.2d 1221, 1224 (Pa. Super. 2004); *Colacicco v. Karumbaya,* 65 D.&C.4th 555, 560 (Lacka. Cty. 2004). Summary judgment may be entered only in cases where it is clear and free from doubt that the movant is entitled to judgment as a matter of law. *The Brotech Corp. v. Delmarva Chemicals Inc.,* 831 A.2d 613, 615 (Pa. Super. 2003).

### (B) *Fraudulent Misrepresentation*

The Bank's first two arguments concern B. Levy's claims of fraudulent misrepresentation. One who fraudulently makes a misrepresentation of fact or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction is liable to the other for any harm caused by justifiable reliance upon the misrepresentation. *Smith v. Renaut,* 387 Pa. Super. 299, 305, 564 A.2d 188, 191 (1989) (citing *Savitz v. Weinstein,* 395 Pa. 173, 178, 149 A.2d 110, 113 (1959)). To recover on a claim of fraudulent misrepresentation, "the plaintiff must prove by clear and convincing evidence six elements: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Goldstein v. Phillip Morris Inc.,* 854 A.2d 585, 590-91 (Pa. Super. 2004).

It has been said that fraud "consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth or look or gesture." *Pittsburgh Live Inc. v. Servov,* 419 Pa. Super. 423, 428, 615 A.2d 438, 441 (1992); *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa. Super. 90, 107, 464 A.2d 1243, 1251 (1983). False information may be communicated either directly through a positive assertion of fact, or indirectly by the nondisclosure of a material fact. See *Coleman v. Sears, Roebuck & Co.,* 319 F. Supp.2d 544, 550 (W.D. Pa. 2003). Therefore, the deliberate nondisclosure of a material fact is regarded as the legal equivalent of an intentional false affirmation. See *Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999); *Fox's Food Inc. v. K-Mart Corp.,* 870 F. Supp. 599, 609 (M.D. Pa. 1994). It is also fraud to induce another "to believe that the act which he does is something other than it actually is." *Delahanty,* 318 Pa. Super. at 107, 464 A.2d at 1252; *Greenwood v. Kadoich,* 239 Pa. Super. 372, 376, 357 A.2d 604, 607 (1976).

Whether fraud has been committed is generally "a question of fact which is always a jury question." *Greenwood,* 239 Pa. Super. at 375, 357 A.2d at 606; *Manning v. Barber's Chemicals Inc.,* 50 D.&C.4th 420, 430 (Mercer Cty. 2000). However, since evidence of fraud must be clear and convincing, the preliminary issue of whether the evidence meets the required standard so as to justify its submission to the jury is a question of law for the court to decide in the first instance. *Gerfin v. Colonial Smelting & Refining Co. Inc.,* 374 Pa. 66, 68, 97 A.2d

71, 72 (1953); *Delahanty,* 318 Pa. Super at 110, 464 A.2d at 1253; *Greenwood,* 239 Pa. Super. at 376, 357 A.2d at 606. Hence, the court must conduct an initial inquiry to determine whether the plaintiff has stated a prima facie case of fraud under the exacting standard in Pennsylvania. *Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1409 (3d Cir. 1991); *Piezo Crystal Co. v. Uddeholm Corp.,* 870 F. Supp. 589, 594 (M.D. Pa. 1994).

## (C) *Justifiable Reliance*

The Bank first contends that B. Levy's reliance upon the Bank's alleged fraud was unjustifiable as a matter of law since section 6.01(b) of the line of credit agreement states that B. Levy's application for, or consent to, liquidation of a substantial part of its assets constitutes an "event of default" entitling the Bank to decline the issuance of further letters of credit. Resolution of that issue "depends on whether the recipient knew or should have known that the information supplied was false." *Porrecco v. Porrecco,* 571 Pa. 61, 70, 811 A.2d 566, 571 (2002); *Fort Washington Resources Inc. v. Tannen,* 858 F. Supp. 455, 460 (E.D. Pa. 1994). In support of its argument, the Bank relies upon the Restatement (Second) of Torts which states, in pertinent part:

"Section 540 *Duty to investigate*

"The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

"Section 541 *Representation known to be or obviously false*

"The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." See *Silverman v. Bell Savings & Loan Association,* 367 Pa. Super. 464, 473, 533 A.2d 110, 115 (1987); *Textile Biocides Inc. v. Avecia Inc.,* 52 D.&C.4th 244 (Phila. Cty. 2001). Under the Restatement standard, "although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Silverman,* 367 Pa. Super. at 473-74, 533 A.2d at 115 (quoting Restatement (Second) of Torts §541 comment a).

The issue of whether a party's reliance on another's fraudulent misrepresentation is justified or unjustified is usually considered to be a question of fact. See *Myers v. McHenry,* 398 Pa. Super. 100, 109, 580 A.2d 860, 865 (1990) (whether party unjustifiably relied upon misrepresentation "should be decided by a jury on the basis of all of the facts and permissible inferences which may be drawn from the evidence presented at trial."); *Corestates Leasing Inc. v. Housewright,* 1998 WL 151028, *9 (E.D. Pa. 1998). Accord, *Silverman, supra* ("The right to rely upon a representation is generally held to be a question of fact."). In deciding whether the recipient justifiably relied on information, the court may consider the history of the negotiation process between the parties. *Tannen,* 858 F. Supp. at 460; *Greenberg v. Tomlin,* 816 F. Supp.

1039, 1056 (E.D. Pa. 1993). Since the "[r]easonableness of reliance involves all of the elements of the transaction," "the question of justifiable reliance is most appropriately left to the jury . . . and is rarely susceptible of summary disposition." *Krisa v. Equitable Life Assurance Society,* 113 F. Supp.2d 694, 706 (M.D. Pa. 2000) (quoting *Williams Controls Inc. v. Parente Randolph Orlando Carey & Associates,* 39 F. Supp.2d 517, 534 (M.D. Pa. 1999)). This is true even if the recipient ostensibly relied upon fraudulent oral communications in the face of written documents which clearly contradict the contents of those verbal statements. See *e.g., Bowes v. Travelers Insurance Co.,* 173 F. Supp.2d 342, 346 (E.D. Pa. 2001) ("The determination of whether or not it was justifiable for the [recipient] to rely on the statements of [defendants'] agent in the face of contrary written policies involves issues of material fact whose resolution should be reserved for the jury."); *Piezo Crystal Co.,* 870 F. Supp. at 596 (whether plaintiff's "reliance upon representations that [defendant] was supplying UHB-20 steel" was justifiable "in light of the fact that the containers carrying steel displayed blue tags which clearly identified UHB-20C steel" was for jury to decide); *Avecia Inc., supra* (declining to grant summary judgment based upon Restatement (Second) of Torts §541 even though verbal representations at issue contradicted wording of signed agreements).

The Bank posits that B. Levy's reliance was unjustified as a matter of law since section 6.01(b) of the parties' agreement notified B. Levy that liquidation of its retail business could be deemed a default and the Bank "promptly advised the B. Levy borrowers that [it] was

declaring a default based on their liquidation of the retail operation." (Dkt. entry no. 63, p. 11.) The Bank's argument overlooks the fact that the terms of a written agreement may be modified subsequently by the parties' conduct or oral representations. See *e.g., Brinich v. Jencka,* 757 A.2d 388, 399 (Pa. Super. 2000), *appeal denied,* 565 Pa. 634, 771 A.2d 1276 (2001); *Fina v. Fina,* 737 A.2d 760, 764 (Pa. Super. 1999). More importantly, "under the estoppel concept, a contract may be modified if either words or actions of one party to the contract induce another party to the contract to act in derogation of that contract, and the other justifiably relies upon the words or deeds of the first party." *Kreutzer v. Monterey County Herald Co.,* 560 Pa. 600, 607, 747 A.2d 358, 362 (2000).

Section 5.02 of the agreement states that B. Levy would not operate its "business other than in the normal and customary course" unless the Bank provided its consent to do so, "which consent [would] not be unreasonably withheld." The Bank's actions as chronicled above clearly raise genuine issues of material fact as to whether the Bank consented in writing to the retail division liquidation and waived the applicability of the default provision in section 6.01(b). In response to the Bank's documented demand in December 1995 that B. Levy liquidate its retail division, B. Levy devised a liquidation plan and timetable which it communicated to the Bank in writing on January 11, 1996. The Bank's own internal memoranda confirm that the Bank later advised the B. Levy principals that the Bank "supported their plan" and even expedited the retail liquidation process. By doing so, the Bank arguably modified the parties' written agreement,

including section 6.01(b), and induced B. Levy "to act in derogation of that contract" by liquidating its retail business, thereby estopping the Bank from strictly enforcing the default provision. *Kreutzer, supra.*

During the 49-day period between January 11, 1996 and February 29, 1996, the Bank never once suggested that B. Levy's liquidation of its retail division would be deemed an event of default. Cf. *Delahanty,* 318 Pa. Super. at 107, 464 A.2d at 1252 (it is fraud to induce another "to believe that the act which he does is something other than it actually is."). The summary judgment record indicates that B. Levy relied upon the Bank's actions and representations by hiring the liquidation consultant recommended by the Bank, terminating its retail stores' leases prematurely, canceling a plethora of retail merchandise orders, and scheduling private liquidation sales of its retail merchandise. It is apparent from the parties' submissions that B. Levy took these detrimental steps in reliance upon the Bank's lack of an objection to the retail liquidation.

Considering the transactional history between the parties and the documented representations made by the Bank, triable issues of fact exist as to whether B. Levy's reliance was justified. To declare under these circumstances that the Bank's representations to B. Levy were obviously and patently false as a matter of law would mean that Pennsylvania law obligates a borrower to presume at all times that its lender is lying when it makes a representation. Our jurisprudence places no such duty of suspicion upon borrowers when dealing with banks. Based upon the materials submitted for review, the issue of whether B. Levy's reliance was justified cannot be decided as a matter of law.

## (D) *Scienter*

To state a viable claim of fraud, B. Levy must establish that the Bank's false statement, concealment or fraudulent act "was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." *Delahanty,* 318 Pa. Super. at 108, 464 A.2d at 1252 (bank officials assured borrower "that the Bank was behind him 100 percent" and did not inform the borrower of its true intentions to the contrary); *Piezo Crystal Co.,* 870 F. Supp. at 594-95. The Bank contends that its alleged actions amount to nothing more than the breach of a promise to do something in the future, which conduct cannot serve as a proper basis for a cognizable fraud claim. See *Shoemaker v. Commonwealth Bank,* 700 A.2d 1003, 1006 (Pa. Super. 1997) ("It is well-established that the breach of a promise to do something in the future is not actionable in fraud."); *Krause v. Great Lakes Holdings Inc.,* 387 Pa. Super. 56, 67-68, 563 A.2d 1182, 1187 (1989), *appeal denied,* 524 Pa. 629, 574 A.2d 70 (1990). The Bank's argument in this regard assumes that the sole basis for B. Levy's fraud claim is the Bank's promise that it "would continue to finance B. Levy's wholesale operations during and following the retail liquidation." (Dkt. entry no. 63, p. 13.)

However, B. Levy's submissions reflect that its fraud claim is multi-faceted. B. Levy avers that the Bank lured it into an alleged default by demanding that it liquidate its retail division, only to later declare B. Levy in default for undertaking the very action that the Bank had demanded. See *Renaut,* 387 Pa. Super. at 305, 564 A.2d at 191-92 (one who induces another to act through any conduct or silence which is calculated to deceive is liable in

fraud for harm caused by the plaintiff's justifiable reliance). B. Levy also claims that it was defrauded by the Bank's declaration of a "sham" default which was merely a subterfuge to cease line of credit advances and to obtain control of B. Levy's cash to pay a Bank loan prematurely. Consequently, B. Levy's fraud allegations concerning the Bank involve much more than a simple promise to perform in the future.

Even assuming arguendo that the linchpin of B. Levy's fraud claim was the Bank's promise to provide continued financing for B. Levy's wholesale operations during the retail liquidation, the Bank still would not be entitled to partial summary judgment. As stated above, the Bank's internal memorandum suggests that the Bank intended to terminate the line of credit prior to May 31, 1996, regardless of the success of B. Levy's retail liquidation. Therefore, there is a genuine issue of fact whether the Bank truly intended to provide continuing financing at the time that it promised B. Levy that it would do so. While it is true that the mere breach of a promise to do something in the future is not tantamount to fraud, "a promise which the promissor had no intention of keeping at the time he made it may be actionable as fraud." *Precision Printing Co. Inc. v. Unisource Worldwide Inc.,* 993 F. Supp. 338, 356 (W.D. Pa. 1998); *Fox's Foods Inc.,* 870 F. Supp. at 609 (denying summary judgment since "sufficient evidence exists in this record for a jury to believe that [defendant] intended not to perform when the promise was made."). As our Supreme Court has noted, "[s]tatements of intention, . . . which do not, when made, represent one's true state of mind are misrepresentations known to be such and are fraudulent." *Col-*

*lege Watercolor Group Inc. v. William H. Newbauer Inc.,* 468 Pa. 103, 115, 360 A.2d 200, 206 (1976). Accord *Jairett v. First Montauk Securities Corp.,* 203 F.R.D. 181, 185 (E.D. Pa. 2001). Accordingly, since B. Levy's submissions indicate that the Bank did not intend to provide continued financing at the time that it promised it would, it is not clear and free from doubt that B. Levy will be unable to prove the culpable state of mind required for a fraud claim.

### (E) *Negligent Misrepresentation*

In addition to advancing a claim for fraudulent misrepresentation, B. Levy alternatively avers that "if such misrepresentations were made negligently, and without the intent to defraud, they constitute actionable negligent misrepresentation because [the Bank] breached its duty to exercise reasonable care in supplying truthful information to B. Levy in connection with B. Levy's conduct of its business." (Dkt. entry no. 12, ¶66.) Negligent misrepresentation requires proof of: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz,* 556 Pa. at 500, 729 A.2d at 561; *Heritage Surveyors & Engineers Inc. v. National Penn Bank,* 801 A.2d 1248, 1252 (Pa. Super. 2002). The differences between fraudulent misrepresentation and negligent misrepresentation are the state of mind of the person making the misrepresentation and the standard of proof that must be met by the plaintiff. *Kerrigan v. Villei,* 22 F. Supp.2d 419, 429 (E.D.

Pa. 1998). With a negligent misrepresentation claim, the misrepresentation must concern a material fact and the speaker need only have failed to make a reasonable investigation of the truthfulness of the representation (*i.e.,* failure to exercise reasonable care in supplying the information). *Bortz, supra; Gibbs v. Ernst,* 538 Pa. 193, 210, 647 A.2d 882, 890 (1994). Furthermore, whereas fraudulent misrepresentation must be demonstrated by clear and convincing evidence, negligent misrepresentation may be established by a preponderance of the evidence. *Kerrigan, supra.*

The Pennsylvania standard for negligent misrepresentation is derived from the Restatement (Second) of Torts §552. See *Gibbs, supra.* Section 552 of the Restatement provides:

*"Section 552. Information negligent supplied for the guidance of others*

"(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) Except as stated in subsection (3), the liability stated in subsection (1) is limited to loss suffered

"(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

"(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

"(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them." Restatement (Second) of Torts §552.

Relying upon *Pflumm Paving & Excavating Inc. v. Foundation Services Co.,* 816 A.2d 1164 (Pa. Super. 2003), the Bank contends that the economic loss doctrine bars B. Levy's negligent misrepresentation claim under section 552 since "any plaintiff with a negligent misrepresentation claim, including the B. Levy borrowers, must present evidence of physical injury or property damage to recover economic damages on their negligent misrepresentation claim." (Dkt. entry no. 63, p. 17.)

The economic loss doctrine developed as a means to protect defendants from liability for unforeseeable harm by limiting the class of potential plaintiffs who may recover in situations where the negligent defendant is unaware of the contract or prospective relation with the injured party. The genesis of this doctrine can be found in the United States Supreme Court ruling in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303 (1927), where the court stated that "[a]s a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong." *Duquesne Light Co. v. Pennsylvania American Water Co.,* 850 A.2d 701, 703 (Pa. Su-

per. 2004) (quoting *Flint,* 275 U.S. at 309). The Pennsylvania courts have formulated a comparable rationale for the economic loss doctrine and have concluded that "[t]he reason a plaintiff cannot recover stems from the fact that the negligent actor has no knowledge of the contract or prospective relation and thus has no reason to foresee any harm to the plaintiff's interests." *Pflumm Paving,* 816 A.2d at 1168-69; *Aikens v. Baltimore and Ohio Railroad Co.,* 348 Pa. Super. 17, 21, 501 A.2d 277, 279 (1985). The Restatement's standard for negligent misrepresentation incorporates this liability restriction by limiting recovery to those "persons for whose benefit and guidance [the defendant] intends to supply the information" and who the defendant intends to be influenced by such information. Restatement (Second) of Torts §552(2)(a) and (b).

The case law cited by the Bank in its legal briefs actually supports this interpretation of the economic loss doctrine. In *Aikens, supra,* employees of a plant that was damaged by a train derailment filed suit against the railroad company seeking to recover damages for lost wages attributable to decreased production at the plant. In dismissing the plant employees' claim for negligent interference with prospective contractual relations under the Restatement (Second) of Torts, §766C, the Superior Court declined to recognize a "cause of action for negligent interference with economic advantage" under section 766C since the defendant had "no knowledge of the contract or prospective relation" with the employees and "no reason to foresee any harm" to them from the derailment. *Aikens,* 348 Pa. Super. at 21, 501 A.2d at 279. The *Aikens* court reasoned that extending negligence liability in such

a context "would clearly lead to problems in consistency and foreseeability, and could be harmful in scope." *Id.* at 22, 501 A.2d at 279. See also, *Linde Enterprises Inc. v. Hazleton City Authority,* 412 Pa. Super. 67, 77, 602 A.2d 897, 901 (1992) (finding that a contractor could not sue an architect for faulty specifications in the absence of privity since the contractor had "not offered a compelling reason why we should deviate from the well-established requirement of privity to adopt a rule holding negligent architects directly liable for economic damages to contractors with whom they share no contractual relationship.").

Similarly, in *Pflumm Paving, supra,* an excavation contractor on a township's library construction project asserted a negligent misrepresentation claim against companies that had contracted with the township to perform subsurface testing for the foundation design. The excavation contractor had not entered into any contract with the subsurface testing companies which issued a geological engineering report in July 1993. More than two years later, the excavation contractor submitted a bid to the township which provided bidding instructions notifying prospective bidders that they "must assume all risks in excavating for this project and shall not be entitled to rely on any subsurface information obtained" by the township. The excavation contractor was later awarded the contract which included express conditions reiterating that contractors could not rely upon the subsurface testing report and were required to "assume all risks in excavating for this project" and to "make their own investigation of existing subsurface conditions." *Pflumm Paving,* 816 A.2d at 1165-66. After the excavation con-

tractor encountered a large quantity of rock and incurred additional expense, he sued the subsurface testing companies for negligent misrepresentation on the grounds that the contractor had allegedly relied upon the geological engineering report which erroneously indicated that rock would not be encountered during excavation. Citing section 552 of the Restatement, the court held that the economic loss doctrine precluded the excavation contractor's claim for negligent misrepresentation. *Id.* at 1171.

In reaching its decision, the *Pflumm Paving* court quoted comment i to section 552 of the Restatement which states that "[t]he maker of the negligent misrepresentation is subject to liability to only those persons for whose guidance he knows the information to be supplied, and to them only for loss incurred in the kind of transaction in which it is expected to influence them, or a transaction of a substantially similar kind." *Id.* at 1170. However, since "none of the defendants provided the 1993 [geological engineering] report, including the drawing, to Pflumm for its guidance in submitting its bid," the Superior Court reasoned that the Restatement comment "does not support Pflumm's argument that the economic loss doctrine does not prevent its claim under section 552." *Id.*

The *Pflumm Paving* court likewise quoted illustration 9 from the Restatement dealing with situations where a defendant owner notifies the subsurface testing company that its "report will be made available to bidders as a basis for their bids and that it is expected to be used by the successful bidder in doing the work." *Id.* Noting that the Restatement recommends that the subsurface testing

company be subject to liability in that instance for an inaccurate or misleading report, the court remarked that it had "no particular disagreement with a finding of liability under those circumstances." *Id.* Nevertheless, it found that example to be distinguishable "because the plaintiff in illustration 9 was informed that the report *was to be used by the bidder in doing its work*" whereas in *Pflumm Paving* the "bidders were specifically told not to rely on the report and to perform their own subsurface investigation." *Id.* at 1170-71. (emphasis in original)

The Superior Court has previously recognized that a bank may be liable for negligent misrepresentations made in connection with financial transactions even if the plaintiff suffers economic harm only. See *e.g., Baker v. Cambridge Chase Inc.,* 725 A.2d 757, 770 (Pa. Super. 1999), *appeal denied,* 560 Pa. 716, 745 A.2d 1216 (1999) (allegations that bank, as owner of townhouse which was conveyed to plaintiffs by a developer, failed to disclose the fact that the developer no longer owned the property, were sufficient to state a claim for negligent misrepresentation under section 552 of the Restatement (Second) of Torts); *Bolus v. United Penn Bank,* 363 Pa. Super. 247, 262-65, 525 A.2d 1215, 1223-24 (1987), *appeal denied,* 518 Pa. 627, 541 A.2d 1138 (1988) (bank held liable for negligent misrepresentations by bank's assistant vice-president in connection with financing provided by bank for plaintiff's construction project). We do not interpret *Pflumm Paving* as overruling that well-established precedent by abolishing all causes of action for negligent misrepresentation where the injured victim suffers only economic damage. Rather, by virtue of its discussion of section 552 and the relevant comments and illustrations,

*Pflumm Paving* stands for the proposition that the economic loss doctrine precludes a claim for negligent misrepresentation if the defendant does not know that the plaintiff will be influenced or guided by the information provided and, therefore, has no reason to foresee economic harm to the plaintiff.

However, if the plaintiff is a person for whose benefit and guidance the defendant intended to supply the erroneous information and the defendant intends the information to influence the plaintiff in a business transaction, the defendant may be liable for pecuniary loss caused by the negligent misrepresentation. See *Bolus, supra.* The economic loss doctrine would not foreclose liability in that event since the negligent defendant's knowledge of the prospective relationship conceivably makes harm to the plaintiff foreseeable by the defendant. Cf. *Ellenbogen v. PNC Bank,* 731 A.2d 175, 188-89 n.26 (Pa. Super. 1999) ("where, as here, the claim is grounded upon a contractually imposed duty . . ., the economic loss doctrine, a feature of tort law, is irrelevant."); *Beecham v. American Life and Casualty Insurance Co.,* 65 D.&C.4th 370, 382 (Lacka. Cty. 2003) (economic loss doctrine did not bar plaintiffs' claims that insurer failed to inform plaintiffs that it had investigated and terminated for misconduct the agent who handled plaintiff's annuity contract and misappropriated their funds since the insurer's knowledge of the annuity contract and the plaintiffs' business relation with the agent furnished a reason to foresee potential harm to the plaintiffs); *Rapidigm Inc. v. ATM Management Services LLC,* 63 D.&C.4th 234, 240-41 (Allegheny Cty. 2003) (economic loss doctrine does not apply to professional negligence

actions where there is privity of contract). Inasmuch as there are legitimate issues of material fact whether the Bank failed to exercise reasonable care in supplying false information to B. Levy in a transaction in which it had a pecuniary interest, and that B. Levy justifiably relied upon that false information by liquidating its retail business, the Bank may be accountable for negligent misrepresentation under section 552 of the Restatement (Second) of Torts. For that reason, the Bank's motion for partial summary judgment will be denied.

## ORDER

And now, August 9, 2004, upon consideration of defendant's motion for partial summary judgment with respect to plaintiffs' claims for fraudulent and negligent misrepresentation, the summary judgment exhibits and memoranda of law submitted by the parties, and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that defendant's motion for partial summary judgment is denied.

